## ADLER v. UNITED STATES.†

(Circuit Court of Appeals, Fifth Circuit. October 3, 1910.)

No. 2,049.

1. BANKS AND BANKING (§ 256*)—NATIONAL BANKS — OFFICERS — OFFENSES—MISAPPLICATION OF FUNDS.

Accused, who was president of a national bank, having overdrawn his account $18,303.80, executed his note to the bank for $20,000, secured by certain corporate stock, the proceeds of the note being used to cancel the overdraft, and the balance was credited to his account, subject to check. The note not having been paid, the collateral was sold for $5,000 cash, which paid the $1,146 additional advancement and $3,800 on the overdraft. *Held*, that the execution of the note was a benefit and not a loss to the bank, and that accused by that transaction was not guilty of misapplying the bank's funds, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497).

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958–964; Dec. Dig. § 256.*]

2. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—DEFENSES—RENEWAL OF NOTES—FORM OF TRANSACTION.

Mere renewal of a note by the officers of a national bank to cover a loan not sufficiently secured did not constitute a misapplication of the bank's funds, in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), because the transaction was accomplished in the form of a discount of the renewal note, by placing the proceeds to the customer's credit and receiving from him a check against the fund for an amount sufficient to pay the old note, without the bank parting with any money.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 958–964; Dec. Dig. § 256.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied November 4, 1910.

**3.** CRIMINAL LAW (§ 656*)—TRIAL—CROSS-EXAMINATION BY JUDGE.

While it is the duty of the trial judge, in a criminal prosecution in the federal court, to facilitate the orderly progress of the trial, and to shorten unimportant preliminaries, and discourage dilatory tactics of counsel, it is improper for the judge to take part in the cross-examination of defendant's witnesses in such a manner as to impress the jury with the idea that the judge had a fixed opinion that accused was guilty and should be convicted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1525; Dec. Dig. § 656.*]

**4.** CRIMINAL LAW (§ 789*)—TRIAL—INSTRUCTIONS—PROVINCE OF JUDGE.

In a criminal prosecution, a trial judge in his charge asserted that in the administration of law in federal courts the judge is in a sense a thirteenth juror, that the judge is authorized to discuss the weight of the testimony with the jury, just as any one of the members of the jury might discuss the same with one another, and in a subsequent paragraph stated that, if the jury convicted defendant, the judge, as a sort of supplemental jury, might set the conviction aside if he did not agree with the verdict, but if the jury acquitted accused, and an error was made in the verdict, that was an end of the possibility of the judge correcting any errors. *Held*, that such instructions were calculated to deprive accused of the right to an acquittal in case the jury were not satisfied of his guilt beyond a reasonable doubt, and were therefore erroneous.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1904–1922; Dec. Dig. § 789.*]

**5.** CRIMINAL LAW (§ 656*)—EXAMINATION—PARTICIPATION BY JUDGE—EXAMINATION OF WITNESSES.

While a trial judge, in the exercise of discretion to expedite the trial, may participate in the examination of witnesses, he should do so in such a manner as to impress the jury with the idea that he was entirely impartial, and so as to avoid the appearance of being an advocate of either side.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1525; Dec. Dig. § 656.*]

**6.** CRIMINAL LAW (§ 1153*)—REVIEW—DISCRETION—EXAMINATION OF WITNESSES—PARTICIPATION BY JUDGE.

The Circuit Court of Appeals is reluctant to interfere with the exercise of the discretion of the trial judge in participating in the examination of witnesses, but will do so when the judge's examination has been conducted in a manner so hostile to the defendant and his witnesses as to probably produce in the minds of the jury the impression that the judge has a fixed opinion that the defendant is guilty and should be convicted.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3064; Dec. Dig. § 1153.*]

McCormick, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

William Adler was convicted of misapplication of funds of a national bank of which he was president, and he brings error. Reversed.

Charles Rosen, William Grant, E. D. Saunders, John P. Sullivan, and Gustave Lemle, for plaintiff in error.

Charlton R. Beattie, U. S. Atty., W. J. Waguespack, Asst. U. S. Atty., and Milton C. Elstner, Sp. Asst. U. S. Atty.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes'

SHELBY, Circuit Judge. The defendant, William Adler, president of the State National Bank of New Orleans, was indicted in 82 counts for misapplication, abstraction, and embezzlement of the funds of the bank. He was tried, and the jury returned a verdict convicting him on 74 counts, to wit, counts 1, 3, 7, and 9 to 79, inclusive, all of which are for the misapplication of funds. The relevant part of the statute on which the counts for the misapplication of funds are based is as follows:

"Every president, director, cashier, teller, clerk, or agent of any association, who embezzles, abstracts, or willfully misapplies any of the moneys, funds or credits of the association * * * with intent, in either case, to injure or defraud the association or any other company, body politic, or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association * * * shall be deemed guilty of a misdemeanor, and shall be imprisoned not less than five years nor more than ten." Rev. St. U. S. § 5209 (U. S. Comp. St. 1901, p. 3497).

1. The first count charges the defendant with the misapplication of $20,000. A condensed statement of that count will show what it is necessary to prove to secure a conviction on it. It charges that the accused, on September 23, 1907, with intent to injure and defraud, executed his promissory note for $20,000, and, as president of the bank, caused the note to be discounted by the bank, and the proceeds to be placed to his credit on the bank's books, to be thereafter withdrawn by him from the bank, and that said amount was wholly lost to the banking association. The note is set out in the count, showing it to be a demand note, secured by the pledge of 200 shares of Siempre Viva Mining Company stock. The count further charges that the note was not well secured, and that the accused was not worth the amount of the note above his other liabilities, as was well known to him at the time he directed the discount. This count, in brief, charges that Adler, by the means described, willfully, wrongfully, and unlawfully misapplied and received $20,000 of the moneys of the bank, and that the bank, by the transaction described, lost that sum. It clearly charges an offense within the statute, and, if the evidence tended to sustain the charge, it was proper to submit the question to the jury. There is no conflict in the material evidence relating to the count.

When this note was made and discounted, Adler's account was already overdrawn $18,303.80. It is not charged that there was any wrong or irregularity in the overdraft. He is not prosecuted for that. The proceeds of the discounted note, being placed to Adler's credit, canceled the overdraft, the amount of which was then represented by or included in his note, and left a cash balance of $1,146 to his credit. This sum he drew out of the bank and used before October 10, 1907. As to the overdraft of $18,303.80, the only effect of the transaction was to include it in the note, and to secure it, so far as it was secured by the collateral. As to the amount of the overdraft, the bank was in a better position than it was before the transaction. No one would claim that, as to the amount of the overdraft its position was worse. The mere change of the form of an existing indebtedness from an account to a note is not a violation of the statute. We must therefore direct our attention alone to the new credit of $1,146 which Adler obtained.

Is it true, as charged, that this sum "was not then and there well secured, as he, the said William Adler, well knew at the time"? We do not think the evidence leaves any doubt that the collateral was sufficient security for this new credit. The record shows that there was realized on the collateral $5,000 in cash, which pays in full the new credit, and pays about $3,800 on the overdraft.

The evidence relating to the transaction described in the first count shows that the bank was not injured, but benefited, by the taking of the note and collateral for the overdraft. It is true that it extended an additional credit for $1,146; but it was well secured, and has been paid, and a further payment secured on the overdraft. The circumstances connected with the overdraft are not presented for consideration. The credit allowed by the overdraft must be presumed to be legitimate and fair till the contrary is charged.

The defendant was entitled to a peremptory instruction directing his acquittal on the first count.

2. The third count charges that on July 8, 1907, the defendant caused H. S. Renshaw, the manager of the firm of Brown & Harris, to make his individual note for $40,000, due on demand, and that the defendant, as president of the State National Bank, caused the note to be discounted by the bank, and the proceeds, $40,000, to be placed to the credit of Brown & Harris on the bank's books, of which firm the defendant was a member, and that by means of such discount the firm obtained a false credit of, and was thereby entitled to draw out, and did draw out, of the bank, the sum of $40,000, which sum was lost to the bank.

The evidence does not tend to sustain the charge that as much as $40,000 was withdrawn from the bank by the discount of the Renshaw note. The facts are that Brown & Harris' account was already overdrawn, as shown by the bank's books, in the sum of $34,753, and in a larger sum, as shown by the account as kept by Renshaw. But the evidence tended to show that, by the discount of the note, Brown & Harris obtained a new credit of $3,054, which they subsequently withdrew from the bank. A conviction could not be based upon the substitution of the Renshaw note for the overdraft of $34,753, so attention must be directed to the new credit which Brown & Harris obtained in excesss of the overdraft. It is contended on behalf of the government that the defendant obtained this new credit with intent to injure and defraud the banking association, and that the sum obtained by the transaction was not secured. The defendant contends that there was no intention to injure or defraud, and that the sum was amply secured by the deposit of collateral. The evidence on this and other issues raised by this count was conflicting. There was evidence tending to show the deposit of 500 shares of Siempre Viva Mining Company stock as collateral security for the Renshaw note; but its deposit and delivery were under circumstances that made it a question for the jury as to whether or not it was really deposited as security for the note. There is much conflicting evidence in the record as to the value of the stock. The evidence that bears on the intention of the defendant in the transaction is voluminous. In some instances it is conflicting, and in others it is of facts from which different conclusions

might be drawn by different minds. We do not think it would serve any useful purpose to comment at length on the evidence relating to this count. It is sufficient to say that we cannot sustain the defendant's contention that, on the record before us, he was entitled to peremptory instructions for an acquittal on the third count. The government presented sufficient evidence to have the count submitted to the jury.

3. The seventh count charges that the accused caused the Schwartz Foundry Company, a corporation in which he owned stock and was a director, to execute a note for $30,000 on August 22, 1907, due four months after date, and that the accused caused the note to be discounted, and the proceeds, $29,282.50, to be placed to the credit of the Schwartz Foundry Company, and that this amount was by it drawn from the bank and was lost to the bank, and that the note was not secured, and the makers had no property out of which the amount of the note could be collected, as was well known to the accused, who had no reason to believe or expect that the note would be paid at its maturity. The count is an elaborate charge of misapplication of funds, charging the intent condemned by the statute. We find no conflict in the controlling evidence which bears on this count. From the charge it would appear that the accused had unlawfully and wrongfully contrived to make the Schwartz Foundry Company gain and the bank lose $29,282.50. The evidence, however, does not show anything of the kind. The $30,000 note on which the count is based was a renewal of a note for the same amount that had been outstanding since August 17, 1905, and had been regularly renewed every four months. It is not charged that when the first note was given, and the money or credit obtained, there was any criminality, or that Adler was in any way connected with the matter. In the transaction charged—the giving of the last renewal note—not a dollar was gained by the Schwartz Foundry Company or lost by the bank. At the time the note was discounted, the Schwartz Foundry Company had to their credit in the bank $1,033.95. The proceeds of the discounted note, $29,282.50, was placed to its credit, which made the amount on the books to its credit $30,316.45. The company drew its check on this fund, payable to the bank, for $30,000, and took up the old note. By the transaction the bank collected the discount on the new note, and we are unable to see that it lost a dollar. The transaction was simply the substitution of one note for another of the same makers, as had been done every four months for the preceding two years. The government does not contend, as we understand its position, that the mere renewal of a note could be the misapplication of funds. But it complains that, "instead of simply giving another note for $30,000 and receiving in place of this new note that note in the bank, the Schwartz Foundry Company deemed it best to actually discount this $30,000 note, dated August 22, 1907, and after the discount thereof check against all the funds there to their credit and pay the old note." It is clear that the mode of renewal complained of was to the interest and advantage of the bank, for the Schwartz Foundry Company used part of the fund that was to their credit and disconnected with this transaction to complete the settlement of the old note. The evidence indisputably shows that

by the transaction charged in this count the Schwartz Foundry Company obtained no money, and that the bank lost none, and that there was no misapplication of the funds of the bank. It is difficult to believe that the statute intended to condemn as criminal transactions by which the bank lost nothing, and could not, in the nature of things, have been subjected to any loss, and by which the accused gained nothing for himself or for others. It may or may not be that there was the misapplication of funds in the granting of the original credit out of which the transaction charged originated. It is sufficient to say that no charge is made based on the obtaining of the original credit. The count in question is based on the renewal of a note. If the money of the bank is misapplied by paying it out on worthless paper, it is clear that the subsequent renewal of such paper, upon which nothing was actually obtained, could not have been a misapplication of the money of the bank. Coffin v. United States, 162 U. S. 677, 16 Sup. Ct. 943, 40 L. Ed. 1109. The court should have granted the defendant's request to direct his acquittal on the seventh count.

4. Counts 9 to 79, inclusive. These counts all relate to overdrafts of Brown & Harris. We consider them all together, as counsel on both sides have so treated them. The counts are all in the same words, except as to the amounts and the dates of the several checks. Each count as to each overdraft charges that the defendant's action in causing it to be paid was with intent to injure and defraud the banking association; that he acted without the knowledge and consent of the banking association, its board of directors and committees; and that the amount of each draft was wholly lost to the bank. The evidence bearing on these counts embraces several hundred pages, and there is great conflict in it and in the inferences that may be drawn from it. There is evidence tending to sustain and to controvert the material charges of these counts. There is much evidence tending to sustain the defendant's contention that these overdrafts were paid in a course of business dealing with Brown & Harris of long standing, and well known to and sanctioned by the directors, and that, as the overdrafts during such course of business were often paid and a balance left to the credit of the drawers, the defendant had reasonable ground to believe that the moneys overdrawn would be repaid. But, considering these counts jointly, the evidence, taken as a whole, on the record as now presented, does not, in our opinion, sustain the defendant's contention that the trial court erred in refusing to direct an acquittal on all of them.

5. The record shows that the trial judge cross-examined the defendant's witnesses at length, his cross-examinations supplementing the cross-examinations of the district attorney and the special counsel for the government, and, in some instances, exceeding theirs in length. These examinations by the judge were critical and apparently hostile to the witnesses. They led to many objections by defendant's attorneys, and to spirited controversies between the attorneys and the judge. Only very brief and few excerpts will be given. Mr. Weil having testified that certain machinery paid for by Adler was received and erected, the trial judge, after the district attorney had cross-examined

the witness, propounded to the witness 32 cross-questions. The judge's examination concluded as follows:

"By the Judge:

"Q. Were you present at any time this machinery was received?

"A. No, sir.

"Q. You don't know of your own knowledge, then, if it ever was received?

"A. We are getting the products of it.

"Q. Don't answer that way.

"A. We are running our mine by electricity; we had no electricity before; so it must have been received.

"Q. I am not talking about that. You understand me exactly; I will ask it again. Were you present at any time when this machinery bought by Adler, or his $100,000, was received?

"A. No, sir.

"Q. Then you don't know if it was received?

"A. No, sir.

"Q. That is a good answer; that is an intelligent answer; that is all I ask. The way you answered at first seemed to misunderstand me ignorantly or purposely."

At another point in the examination of this witness, the following occurred:

"By Defendant's Attorney:

"Q. Mr. Weil, you have been sworn?

"A. Yes, sir.

"Q. Mr. Weil, what office do you hold in the Siempre Viva Mining Company?

"A. I am the treasurer.

"Q. You are the treasurer?

"A. Yes, sir.

"Q. Do you know of your own knowledge as to whether or not William Adler owns any stock in that company, and, if so, how many shares, and what did he pay for it?

"A. He owns—

"By the Judge:

"Q. Where are the books of that company?

"A. In Bluefields, Nicaragua.

"Q. Have you been to Bluefields recently?

"A. I am compelled to sign every certificate—

"Q. Have you anybody to supervise or look after the mining stock or the books?

"A. I was at Bluefields 15 months ago.

"Q. You call that lately?

"A. No, sir; 15 months ago.

"Q. The jury and myself want the best evidence we can get, and that would not be the best evidence on that issue. However, you can offer it, if you choose to."

During the examination of Mr. Culbertson, a witness for the defendant, the following occurred:

"By the Judge:

"Q. I want to ask you a question for my personal satisfaction. You were the president of the State National Bank?

"A. Yes, sir; for a short while.

"Q. Do you believe this pledge had any legal force and effect, indicated by anything that is on this envelope?

"By Defendant's Attorney:

"I object to that, on the ground that it calls for the opinion of the witness, and is incompetent.

"By the Judge:

"Your objection is wholly adverse to the great purpose we are pursuing in this court. We do not trouble ourselves with such objections. I am asking

this because he said the other day that was a pledge—that this note was a pledge.

"By Defendant's Attorney:

"I am prepared, your honor, to argue and convince your honor it was a valid pledge.

"By the Judge:

"I will not listen to your argument on that point. I am asking if he took the position it was a valid pledge.

"By Defendant's Attorney:

"If your honor's question is, if he took it as a valid pledge, I have no objection.

"By the Judge:

"He said the other day he did, and I want to know if he believes it was, in force and effect, a valid pledge.

"By Defendant's Attorney:

"I do not object, if you ask him if it was a valid pledge.

"By the Judge:

"Why did you object, then? It was because you did not understand what I was saying?

"By Defendant's Attorney:

"I understood. I have no objection to the question as to whether he took it as a valid pledge.

"By the Judge:

"You certainly did object.

"Q. Did you see any evidence to have you believe, in a legal sense, as between pledgor and pledgee, that that security was a valid pledge?

"By Defendant's Attorney:

"I object to that question.

"The Witness:

"I say, technically, no.

"By the Judge:

"You are captious and facetious, and unnecessarily—

"By Defendant's Attorney:

"I am not captious and facetious, your honor, but—

"By the Judge:

"He said this was an evidence of the pledge. I want him to say where it was evidence of the pledge.

"By Defendant's Attorney:

"I have no objection to his stating as to whether it was received as a pledge or not, as a fact, but I do object—

"By the Judge:

"Then I overrule your objection.

"Q. I ask you to show me where—in your judgment, you having been the author of the transaction, whether you believed it was a pledge or not?

"By Defendant's Attorney:

"I except to the ruling of the court.

"A. Do you refer to me, Judge, as saying it was a pledge?

"By the Judge:

"Q. What was it for—what was the collateral for?

"A. I stated, to the best of my recollection, that Mr. Adler had lodged these securities with the bank as collateral security for this note of Renshaw's.

"By the Judge:

"Q. And the security was not pledged to the bank?

"A. In that way they became pledged.

"By the Judge:

"Q. Were they pledged in law that way?

"By Defendant's Attorney:

"I make the same objection.

"A. It is quite a common thing among banks—

"Q. You had better be advised better by your lawyers. That will do.

"By Defendant's Attorney:

"I enter an exception to that statement of the court.

"By the Judge:

"I ,enter an exception to your annoying me with captious and facetious objections."

During the progress of the trial, the court said, in reference to objections made by one of the defendant's attorneys:

"You see, you go off half-cocked. You see your objections are not founded in fact."

And, again:

"You are troublesome, like a schoolboy."

The trial judge, under the federal system, is not only permitted, but it is his duty, to participate directly in the trial, and to facilitate its orderly progress and clear the path of petty obstructions. It is his duty to shorten unimportant preliminaries, and to discourage dilatory tactics of counsel. The purpose of the trial is to arrive at the truth, and without unnecessary waste of time. In performing his duties, it may become necessary to shorten the examination of witnesses by counsel, and there is no reason why the judge should not propound questions to witnesses when it becomes essential to the development of the facts of the case. This is a matter within the discretion of the court, with which we would be reluctant to interfere. But the conduct of the judge, in the performance of all his duties, should appear to be impartial. The impartiality of the judge—his avoidance of the appearance of becoming the advocate of either one side or the other of the pending controversy which is required by the conflict of the evidence to be finally submitted to the jury—is a fundamental and essential rule of especial importance in criminal cases. The importance and power of his office, and the theory and rule requiring impartial conduct on his part, make his slightest action of great weight with the jury. While we are of opinion that the judge is permitted to take part impartially in the examination or cross-examination of witnesses, we can readily see that, if he takes upon himself the burden of the cross-examination of defendant's witnesses, when the government is represented by competent attorneys, and conducts the examination in a maner hostile to the defendant and the witnesses, the impression would probably be produced on the minds of the jury that the judge was of the fixed opinion that the defendant was guilty and should be convicted. This would not be fair to the defendant, for he is entitled to the benefit of the presumption of innocence by both judge and jury till his guilt is proved. If the jury is inadvertently led to believe that the judge does not regard that presumption, they may also disregard it.

A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge. Besides, the defendant's counsel is placed at a disadvantage, as they might hesitate to make objections and reserve exceptions to the judge's examination, because, if they make objections, unlike the effect of their objections to questions by opposing counsel, it will appear to the jury that there is direct conflict between them and the court. If it were the function of the judge in this country, as it is in some foreign tribunals, to perform the duties incumbent here on the district attorney, the impression produced

on the minds of the jury against the defendant would not be so inevitable. Counsel are expected to maintain an attitude of respect and deference toward the judge, and this attitude is maintained without difficulty when the judge confines his activities to the usual judicial duties. And the judge can more easily treat counsel with the respect due an officer of the court in the performance of a duty, if he avoids the performance of the duties incumbent properly upon an attorney representing one side of the case. The evidence, taken as a whole, might be so conclusive of the defendant's guilt that an appellate court would not be justified in interfering with the judgment on this account alone. But in a case where there is substantial conflict in the evidence as to the essential points that were required to be submitted to the jury, the course of the judge in unnecessarily assuming to perform the duties incumbent primarily upon others might make it the duty of an appellate court, on this ground alone, to grant a new trial. But this case does not turn alone on this point.

6. The learned trial judge, in his charge to the jury, said:

"You sometimes heard me say, somewhat in humor, but the saying is vindicated in the jurisprudence of the federal courts, that the judge is, in a sense, a thirteenth juror. Such a remark may be vindicated, in the methods and practice shown in the decisions of the federal courts, in this way, that the judge may discuss with the jury, just as any one of you intelligent jurors might discuss with one another, the weight of testimony.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

"I say that because, as the attorney for the government said to you yesterday, your power, in a sense, as a jury, reaches beyond mine as a judge. He said, if the jury convicts the defendant, the judge himself comes in as a supplementary jury, you might call it, and can set it aside, because he did not agree with it; but if you acquit him, and an error is made in the verdict, that is an end of the possibility of the judge correcting any errors, and in that sense the attorney for the government properly said that a jury's prerogative, power, or duty was higher than the judge's, because, if they convict, the judge himself comes in, and, if he chooses, gives him a new trial; but, if they acquit, there is nothing more remedial in law as to that case."

There is no doubt about the right of the judge to express his opinion as to the evidence. He must, of course, do this with due regard to the right and duty of the jury to exercise an independent judgment. And, to avoid a compelling influence, his views should be stated with the circumspection and caution which should characterize all judicial utterances. The first excerpt above quoted, standing alone, probably means nothing more than to assert the right of the judge to express to the jury his opinion upon the evidence. With that construction, there could be no objection to it. But in the second excerpt the judge is referred to as a "supplementary jury," vested with the right to review the action of the jury, and the attention of the jury is called to the fact that, if they acquit the defendant, the judge is powerless to correct the verdict, although the acquittal may not be justified by the evidence, but that a mistaken conviction may be corrected by the judge. It seems to us at least quite probable that the jury would construe this charge as an instruction that, if they had reasonable doubt as to what their verdict should be, they should not acquit, because the judge, as a "supplementary jury," could not correct their verdict, but under such circumstances they could safely convict, because, in that event, the

judge had the power to set aside their verdict. It was, of course, the duty of the jury, if the evidence left them in reasonable doubt of the defendant's guilt, to acquit him. They had no right to convict if they had such doubt, relying on the court to set aside the verdict if it did not meet the court's approval. The language, it seems from the bill of exceptions, was first used as an argument by one of the government's attorneys, and was afterwards adopted by the court as a part of its charge. It plainly bears the construction of being an argument for conviction, and, as such, it has no proper place in a charge of the court to the jury.

We do not think that the prejudicial effect of this charge was certainly removed by other portions of the learned judge's instructions to the jury.

Considering the whole record in this case, the judge's participation in the cross-examination of the defendant's witnesses, the objections and controversies which ensued, and the instructions to the jury which we have quoted, we are of opinion that the judgment should be reversed, and the cause remanded for a new trial.

Reversed.

McCORMICK, Circuit Judge, dissents.