# BUDD v. UNITED STATES.

Appeal; Error; Necessity of Exception; Improper Remarks to Jury; Examination of Witness by Court.

1. Error on the reception of evidence as to a certain matter cannot be reviewed on appeal, where all questions relative to such matter were answered without objection, except one, which was not answered; since a ruling by the trial court must be secured, and an exception taken thereto to obtain a review thereof.

2. Error in the reception, on a prosecution for murder, of evidence tending to show that the accused was guilty of adultery, does not come within the exception of a plain error in a matter absolutely vital to the defendant, to the rule requiring an objection and exception to review an error of the trial court.

3. The statement by counsel for the government, in his argument to the jury on a prosecution for murder, that the evidence shows that the accused was a married woman and had a child, does not impute to her anything wrong, so as to be objectionable as an argument that she was guilty of a crime other than that charged in the indictment.

4. A short and impartial examination by the trial judge of the defendant, charged with causing the fatal burning of another by throwing a lighted lamp at her, as to whether she could not have taken a chair instead of the lamp to defend herself, is not an abuse of his right to see that the facts of the case are brought intelligibly to the attention of the jury.   (Mr. Justice Robb dissenting.)

No. 3189.   Submitted December 2, 1918.   Decided February 3, 1919.

Hearing on an appeal from a judgment of the Supreme Court of the District of Columbia, on verdict, in a criminal prosecution for murder.

The facts are stated in the opinion.

Note.—On the question of reversal or conviction because of unfair or irrelevant argument or statements of facts by prosecuting attorney, see notes in 46 L.R.A. 641, and 34 L.R.A. (N.S.) 811.

*Mr. C. C. Miller* and *Mr. David Wolf* for the appellant.

*Mr. John E. Laskey,* United States Attorney, and *Mr. William E. Leahy,* Assistant, for the appellee.

Mr. Chief Justice SMYTH delivered the opinion of the Court:

The appellant, Margaret Budd, was convicted of murder in the second degree, and brings the judgment to this court for review, assigning three errors; namely, that evidence was received tending to show that she was guilty of a crime other than that charged in the indictment; that the district attorney should not have been permitted, in his argument to the jury, to state the evidence tending to show she was guilty of another crime; and that the court erred in putting certain questions to her while she was on the stand as a witness in her own behalf. Only one of the assigned errors was discussed at the bar, but we shall consider the three.

It is assumed in the brief of the appellant that evidence was received tending to show that she was guilty of the crime of adultery; but the place in the record where this evidence may be found is not pointed out, and we have not been able to locate it. The only testimony which has any bearing upon the subject is substantially as follows: Defendant was asked how long she had known the deceased, and she answered, "All my life." She was then asked, "Did you not just know her since you started to live with her brother," to which she answered, "No, we were from the same home." None of these questions was objected to. Another question put by counsel for the government was this: "You had not lived with your husband for a year, had you?" To which an objection was made. The court did not rule on it, neither did the witness answer; but the court inquired, "Who was your husband, do you mean Hodges?" To which she responded, "No, I mean Louis Walter Budd, the man I married."

Only one question then was objected to and that was not answered. No vice could flow from this. The other questions

were all replied to without objection. We have therefore no ruling of the court concerning this testimony to which exception was reserved. In these circumstances there is nothing for us to review. It is well settled that "a party must make every reasonable effort to secure from the trial court correct rulings, or such at least as are satisfactory to him, before he will be permitted to ask any review by the appellate tribunal; and to that end he must be distinct and specific in his objections and exceptions." Thus spoke Justice Brewer for the Supreme Court of the United States in *Allis* v. *United States,* 155 U. S. 117, 122, 39 L. ed. 91, 93, 15 Sup. Ct. Rep. 36, a criminal case in which the defendant had been sentenced to five years in the penitentiary.

In *Queenan* v. *Oklahoma,* 190 U. S. 548, 551, 47 L. ed. 1175, 1178, 23 Sup. Ct. Rep. 762, where the defendant was convicted of murder and sentenced to be hanged, the court refused to review an objection as to the qualification of a juror to sit in the case, because it was not made in the court below; citing *Kohl* v. *Lehlback,* 160 U. S. 293, 299, 40 L. ed. 432, 434, 16 Sup. Ct. Rep. 304, and *Raub* v. *Carpenter,* 187 U. S. 159, 164, 47 L. ed. 119, 121, 23 Sup. Ct. Rep. 72. The only exception to this rule is where a plain error has been committed in a matter "absolutely vital" to the defendant, as in a case where he had not asked the court to instruct the jury to acquit him although there was no evidence to sustain a verdict of guilty against him. *Wiborg* v. *United States,* 163 U. S. 632, 658, 41 L. ed. 289, 298, 16 Sup. Ct. Rep. 1127, 1197. See also *Clyatt* v. *United States,* 197 U. S. 207, 221, 49 L. ed. 726, 731, 25 Sup. Ct. Rep. 429. The case at bar is not within the exception.

Even if the questions had all been objected to and an exception reserved to each ruling thereon the result would be the same, for they were justified by the record. The only question which by any possibility is open to a sinister meaning is the one wherein the defendant was asked, "Did you not just know her since you started to live with her brother?" If this implied that she maintained adulterous relations with the

brother of the deceased, none the less it was warranted by what
had preceded; for the witness Shields had said that "Margaret
[the defendant] and Hodges [the brother of the deceased]
had the front room on the same floor," and that he occupied
the back room, there being but two rooms on the floor. Pansy
Tabbs, another sister of Hodges, said that "James [the brother]
lived with Margaret there." We think, therefore, that the first
assignment of error must be rejected.

During the argument to the jury, counsel for the govern-
ment said: "The evidence shows that this was a married
woman, that she had a child," to which objection was made and
overruled. This constitutes the basis of the second assignment
of error. It is assumed that the "married woman" referred
to was the defendant, but there is nothing in the record to show
it. If it be admitted that the assumption is correct, we are
unable to perceive how a statement that she was a married
woman and had a child imputed to her anything that was
wrong.

The defendant threw a lighted lamp at Mary Bragdon, there-
by setting fire to her clothes and causing her death. She con-
tended that Mary had assaulted her with a chair and that she
in self-defense threw the lamp.

While the defendant was on the stand as a witness in her
own behalf the following colloquy took place between her and
the court:

Q. Was there any other chair there?

A. There were two straight chairs there.

Q. Except the one she had?

A. Yes, sir.

Q. Why did you not take one of those chairs?

A. There wasn't any way in the world—

Q. Why did you not take one of those to defend yourself
with?

A. There wasn't any way I could move.

Q. You mean to tell me you could not have picked up one
of those chairs?

A. If I had —

Q. Where were those chairs?
A. The chairs were too far from me.
Q. Where were they, were they not right beside that table?
A. No, because there were two windows.
Q. Tell the jury where those other two chairs were.
A. I couldn't tell exactly where those chairs were.

Thereupon her counsel said: "I want to note an exception to your Honor's inquiry as to why she did not take the chair instead of the lamp to defend herself." According to the rule which prevails in Federal jurisdictions, the judge presiding at a trial "has a right, and, indeed, it is his duty, to see that the facts of the case are brought intelligibly to the attention of the jury, and to what extent he will intervene for this end is a matter of discretion." *New York Transp. Co.* v. *Garside,* 85 C. C. A. 285, 157 Fed. 524. See also *Berwind-White Coal Min. Co.* v. *Firment,* 95 C. C. A. 1, 170 Fed. 151, and *Adler* v. *United States,* 104 C. C. A. 608, 182 Fed. 472. Of course this discretion may be abused. An examination by the judge so prolonged or conducted in such a hostile or critical manner as to indicate to the jury that the court disbelieves the witnesses, or that he has taken sides with either party to the controversy, might be ground for reversal. (See decisions just cited.) But there is nothing of that nature in the interrogatories addressed to the defendant by the learned trial justice in the case before us. He, we think, was fully within his rights in propounding them.

Even though they created in the minds of the jurors an impression unfavorable to the defendant, it must have been entirely removed by the court's instruction. The court first approved four requests for instructions made by the defendant. They presented from varying angles her contention that the killing was justified. When the court came to give its general charge to the jury it referred to those requests, which had already been read to the jury by the defendant's counsel, and emphatically approved them and then gave three additional instructions upon the same subject, which were equally advantageous to the defendant's theory. The effect of this course

upon the part of the court must have been to convey to the jury the belief that there was much force in her defense of justifiable homicide.

While the question was not raised in the court below, nor by the assignments of error, the brief, or the oral argument here, and there is no duty resting upon us to consider it, we have searched the record with care for the purpose of determining whether or not there is sufficient evidence to sustain the verdict of murder in the second degree.

As we have heretofore stated, there was testimony that the defendant lived in the same room with the brother of the deceased. It appears that on the day of the tragedy the brother desired to celebrate his birthday, and that he had invited a number of persons, male and female, to his room for that purpose. He testified that he had asked his sister Mary "to come to his house that night." The witness Clark testifies to the same effect with respect to the invitation. A quarrel ensued between defendant and Mary, according to the former. Mary, she says, called her a vile name and said she was going to kill her. Thereupon, testified the defendant, "I walked across the floor and I asked her three times, and she picked up a chair and struck me across the shoulder, and the second time she drew the chair back and hit me I threw the lamp, and threw the lamp to defend myself."

Another witness testified that the defendant backed away from Mary and "kept on telling her, 'Go 'way, Mudgy,' three or four times." But it happened that the defendant in backing away backed to where the lamp stood on a table, and as soon as she reached it she picked it up and threw it at Mary, although the latter was then 6 feet away from her,—"she was just far enough away in case she had hit at her again *she could not have reached* her with the chair she had." The defendant was a larger woman than her victim. She was "about a head, or maybe a head and a half, taller than Mary was." Shields, a friend of the defendant, if we are to judge by his testimony, was in the hallway at the time of the affray and witnessed it all. He was where he could have speedily ren-

dered assistance if the defendant needed any, and this she must have known. Whether or not there were other male friends in the room at the time is not quite so clear.

The chair which Mary used was "an ordinary straight-back bedroom chair." Shields testified "that he didn't see any cuts on Margaret or bruises or marks at all," as the result of the alleged blow dealt by Mary. Police Officer Nealon, who visited the defendant's room not "more than five minutes at the longest after the trouble occurred," said that the "lamp was all broken;" that "there was no chair lying down on the side. I am positive of that;" that the table was not tipped over or broken, "because some of the dishes were on it;" that on the table "there may have been altogether, cups and dishes and all, perhaps a dozen." They were not broken so far as he saw, but were "undisturbed."

The testimony, if believed, tended to show that Mary was rightfully in the room when she was assaulted; that the defendant was the aggressor; that there was no struggle, else probably the dishes would have been disturbed and the chairs overturned; that the defendant was a more powerful woman than Mary; that a male friend stood near to aid her in case of necessity; that if Mary struck her the blow was a light one, because it left no mark; and, finally, that the defendant had no reason to believe that she was in imminent danger of death or great bodily harm when she hurled the lighted lamp at her victim.

Other testimony in the record would perhaps sustain opposite conclusions, but it was for the jury, not the lower court or this court, to choose beween the conflicting versions and say which should be credited.

A short time after the tragedy the defendant was in the alley near the house in which she lived. The witness Clark, a disinterested person, said of the defendant at that time: "The officers had her by the arm, and she said, 'I have done what I intended to do, and I don't give a G— D— what they do with me,' and the officer says, 'It is an awful thing to burn a woman up like that,' and she says, 'I have done what I in-

tended to do, and I don't give a G— D— what the law does.' She told them to turn her loose and let her get her hands on the sister [Mary's], and she would be willing for the law to take effect, that *she intended to kill both of them.*"

One of the police officers who apprehended her testified: "We asked her on her way to the station why she burnt this woman, and she said she did burn the b— and she would do it again; she did not care if she served thirty years or even a hundred years."

Another officer said · "she was not noticeably intoxicated. * * * She began to talk about it [the affray] as soon as she was arrested, and she said she was glad she had done this and *she had been after this woman for years,* and she said, 'If you let me go I will get the other one too,' meaning the sister."

Lieutenant Wilson and Officer Holmes fully corroborated these statements of the other police officers and of the witness Clark.

True, the defendant testifying on her own behalf said that she had always been friendly with the deceased; but if this were true her other statements were false; and, as we have before remarked, it was for the triers of fact, not for the court, to determine which story contained the truth. If the jury believed the witness Clark and the police officers, there was ample evidence that the defendant at the time she threw the lamp was filled with a consuming malice toward the deceased and intended to destroy her. Indeed, it might be said on this theory that there was evidence not only of malice, but of premeditation sufficient to justify a verdict for murder in the first degree.

We are convinced that the record is entirely free from error and that the judgment should be affirmed.        *Affirmed.*

Mr. Justice ROBB dissenting:

Owing to the importance of this case, I deem it my duty briefly to state the grounds of my dissent.

The defendant was indicted and tried for murder in the

first degree, the indictment alleging that she "feloniously, wil-
fully, purposely, and of her deliberate and premeditated mal-
ice, did cast and throw at, against, and upon the said" de-
ceased, a lighted lamp. She was convicted of murder in the
second degree and sentenced to the penitentiary for twenty
years.

Deceased's brother, James Hodges, and the defendant, were
living together. They are evidently colored people, and a
careful study of the record shows that the defendant is not
of a high order of intelligence. This fact should be kept in
mind in characterizing the act here complained of.

On the evening of Thanksgiving Day, 1916, Hodges was hav-
ing a birthday celebration, and several friends or acquaint-
ances were present. He was more or less intoxicated, and, al-
though a witness for the government, remembered very little
of the occurrences of the evening. The government, however,
put upon the stand one Sylvester Shields, who, notwithstand-
ing that he also had been drinking "right smart," had ob-
served and remembered those occurrences. In the majority
opinion this witness is characterized as "a friend of the de-
fendant's." Why I do not know, for there is no testimony
to that effect. He was a witness for the government, and there
is nothing in his testimony to indicate that he was prejudiced
either for or against the defendant. In other words, he ap-
parently was trying to tell the truth. He testified that Hodges
and the defendant "got to fussing about the whisky, and he
(Hodges) jumped up and hit her, and while they were fight-
ing she pushed him and he fell downstairs. * * * He missed
his foot and slipped and fell down the steps." The celebration
was being held upstairs, and the rooms on that floor were light-
ed by oil lamps. After the trouble between Hodges and the
defendant all the others present, save Shields, left. Soon after
Hodges had been pushed or had fallen downstairs, his two
sisters (deceased, whose name was Mary Bragdon, and Pansy
Tabbs) appeared at the foot of the stairs, and Mary, notwith-
standing the repeated injunctions of the defendant that she
"go 'way, Mudgy," persisted in ascending, and, upon entering

the room, the defendant's home, "grabbed a chair and hit Margaret (defendant) before she could get back many steps." Mary said she wanted to know "what Margaret was doing fighting her brother. * * * What are you doing pushing my brother down the stairs?" To this defendant replied that she did no more than defend herself. Defendant "kept on telling her, 'Go 'way, Mudge,' and when she (Mudge) hit her (defendant) with the chair the second time she took the lamp and hit her with it." Shields further testified that "before Margaret (defendant) threw the lamp she said, 'Go 'way, Mudgy.'" According to the testimony of this witness, "Mary was about 6 feet from Margaret when Margaret threw the lamp; she was just far enough away in case she had hit at her again she could not have reached her with the *chair she had.*" On cross-examination the witness testified that when Mary came in the door the defendant "backed off back and kept telling her to 'go 'way, Mudgy.'" The table on which the lamp was setting was against the wall. The only other eyewitness was the defendant, whose testimony did not differ materially from that of the government's witness.

According to the uncontradicted evidence, therefore, the defendant was in her own home when the deceased, for the deliberate and obvious purpose of assaulting the defendant for a real or fancied grievance growing out of the quarrel between deceased's brother and the defendant, entered defendant's home against the repeated admonitions of the defendant, and, armed with a chair, although defendant was unarmed and "backing off back," was putting that intent into execution. It is undisputed that the defendant retreated as far as she could, and that the nearest thing at hand was the lamp. While defendant was testifying, the court asked her whether there was not another chair in the room, and she replied that "there were two straight chairs there." The court then asked: "Why did you not take one of these to defend yourself with?" Witness answered: "There wasn't any way I could move." Whereupon the court said: *"You mean to tell me you could not have picked up one of those chairs?"* and witness answered.

"If·I had ——," when the court asked, "Where were those chairs?" Defendant replied: "The chairs were too far from me." The court then inquired, "Where were they, were they not right beside that table," and defendant replied, "No, because there were two windows."

Defendant's counsel at the proper time, that is, at the close of this cross-examination of the defendant by the court, noted an exception to the court's "question as to why she (defendant) did not take the chair instead of the lamp to defend herself." The obvious intent of this exception was to challenge the attitude of the court in conducting the examination, and the exception is so treated in the briefs of counsel for defendant and the government. The words of the court in *Adler* v. *United States,* 104 ·C. ·C. A. 608, 182 Fed. 472, are here pertinent: "A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge. Besides, the defendant's ·counsel is placed at a disadvantage, as they might hesitate to make objections and reserve exceptions to the judge's examination, because, if they make objections, unlike the effect of their objections to questions by opposing counsel, it will appear to the jury that there is a direct conflict between them and the court."

At the moment defendant threw the lamp, the deceased, having twice hit her with a chair, stood within about 6 feet of her, with the chair in hand ready for a third assault upon the defendant, whose back was to the wall, yet under the view of the court, conveyed to the jury through his cross-examination of the defendant, the defendant, even though she believed herself to be in imminent danger,—as she undoubtedly was,—might and should have turned aside and seized the chair, instead of taking advantage of the nearest means of defense. In the circumstances of this case, I think the court committed material error in this cross-examination. It tended to characterize defendant's testimony, on the vital point in the case, as untrue, and to prejudice her in the minds of the jury. While the court apparently recognized the malicious intent and men-

acing attitude of the deceased at the moment the lamp was thrown, by asking the defendant why she did not take a chair to *"defend"* herself, the effect of the forceful repetition of the question was to lead the jury to believe that, in the opinion of the court, the defendant's answer was so unreasonable as obviously to be untrue. If that was not conducting the cross-examination in such a "critical manner as to indicate" disbelief in the witness, I am at a loss to characterize the occurrence.

Defendant was arrested within a few minutes after the occurrence, and the four police officers who accompanied her to the police station testified as to the statements made by her at the time. No two agree as to what she said, and one testified that she *"seemed to be very much excited."* The substance of their testimony was that the defendant expressed satisfaction at what she had done, and one of these policemen testified that defendant said "she had done what she intended to do for a year if she had an opportunity." This was the sole evidence upon which the government relied to show malice, and the testimony of witnesses put upon the stand for the prosecution was to the effect that the relations between defendant and deceased always had been cordial,—that they had had no trouble whatever. Notwithstanding this, the court submitted to the jury the question of first and second degree murder. While no exception was taken, in a criminal case of this magnitude the court should see that the rights of the defendant are protected. *Lomax* v. *United States,* 37 App. D. C. 414; *Miller* v. *United States,* 38 App. D. C. 361, 40 L.R.A.(N.S.) 973; *Heim* v. *United States,* 47 App. D. C. 485, L.R.A.1918E, 87; *Wiborg* v. *United States,* 163 U. S. 632, 41 L. ed. 289, 16 Sup. Ct. Rep. 1127, 1197; *Crawford* v. *United States,* 212 U. S. 183, 53 L. ed. 465, 29 Sup. Ct. Rep. 260, 15 Ann. Cas. 392. In view of the uncontradicted evidence as to the situation of the parties when the lamp was thrown, it is my opinion that the court committed error in not ruling that there was no evidence upon which to base a verdict of murder in either the first or second degree. The defendant was in her own home. She had been, and was being, assaulted. She did more than

the law required of her,—she retreated and called upon the deceased to desist, and not until she had repeatedly admonished the deceased in vain did she throw the lamp. How, then, may it be said in reason that any of the elements of murder were present? My associates apparently are of the view that a person is not justified in believing himself to be in danger because another, who already has struck him twice with a chair, is 6 feet from him, although at the moment holding the chair in a menacing attitude. I differ with them on this point. The real test of danger in a case like this is how the question appeared to the defendant in the excitement of the critical moment. To say that there is any evidence even tending to show that defendant was not justified in believing herself to be in danger of further assault is, in my view, to displace facts with theory. The most that can be said is that, owing to the confusion, excitement, and hot blood engendered by the assault admittedly made upon her in her own home, the defendant may have gone too far in her defense and may have been guilty of manslaughter.