## UNITED STATES v. MINUSE et al.

### No. 380.

Circuit Court of Appeals, Second Circuit.

Aug. 7, 1940.

Robert Williamson and Bernard J. O'-Connell, both of New York City, for defendant-appellant Norman W. Minuse.

Carl O. Hoffmann, of New York City (A. Zanger and E. G. Magennis, both of New York City, of counsel), for defendant-appellant Joseph E. H. Pelletier.

John T. Cahill, U. S. Atty. of New York City (Boris Kostelanetz and Raymond Ickes, Asst. U. S. Attys., both of New York City, of counsel), for plaintiff-appellee.

Before SWAN, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendants Minuse and Pelletier were indicted under Section 88 of Title 18 of the United States Code, 18 U.S.C.A. § 88, for conspiring with other persons to violate the provisions of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., prohibiting the manipulation of security prices on a National Securities Exchange. Those provisions read as follows:

"Sec. 9 [§ 78.] (a). It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

"(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security, (A) to effect any transaction in such security which involves no change in the beneficial ownership thereof, or (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

"(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

The indictment in substance alleged as particulars of the conspiracy:

(1) That the defendants through instrumentalities of interstate commerce would effect transactions in stock of Tastyeast, Inc., which involved no change in the beneficial ownership;

(2) That defendants would enter numerous orders for Tastyeast stock with the knowledge that orders of substantially the same size would be entered by them or their agents at substantially the same time for the purpose of creating a false and misleading appearance of active trading in the stock;

(3) That the defendants would create actual or apparent active trading and raise the price in the Tastyeast stock for the purpose of inducing the purchase of the stock by others;

(4) That the defendants would obtain an option on 73,000 shares of Tastyeast stock and on the basis of the inflated exchange prices and activity would sell the stock over the counter, a considerable portion of which they had taken at lower prices under the option;

(5) That the defendants would pay secret bonuses to customers men and other persons to induce purchases of Tastyeast stock and would induce friends and associates by means of guarantees against loss and rebates or discounts on the purchase price to purchase Tastyeast stock and thereby raise and inflate the price of the security.

After a statement of the factum of the conspiracy some twelve overt acts were set forth in the indictment. The conspiracy originated from an agreement dated September 17, 1935, by one Levy to purchase 79,000 shares of Tastyeast stock from that company. Levy was to buy the stock at prices ranging from $2.50 to $3.25 per share, less 20% selling commissions. On November 16, 1935, the shares under this option were registered with the Securities and Exchange Commission and approved by it for listing on the New York Curb Exchange. In October, 1935, Levy met Minuse and Pelletier, and on November 18, 1935, made a contract with N. W. Minuse & Co. (the defendant's firm) whereby the latter were to take up 73,000 of the shares covered by this option for 79,000 at prices ranging from $2.50 to $3.25 less 15% commissions in marketing the stock. The firm of Minuse & Co. had in its employ one Stuart who was a market letter writer and a so-called "statistician." He was one of the defendants named in the indictment and pleaded guilty. The firm had a financial backer named Trezise who was the cashier of a small bank in Pennsylvania from which he stole approximately $130,000, a large amount of which he diverted to the use of the Minuse firm.

The total issue of the stock of Tastyeast was 260,000 shares. During the period from October, 1935, to January 9, 1936, 103,400 shares of Tastyeast stock were traded in on the New York Curb. Of this total Minuse & Co. purchased 25,600 shares or 24.8%, and sold 35,200 shares or 34.1%. During the period from March 6, 1936, to April 25, 1936, 89,300 shares were traded in on the Curb and the purchases and sales of Minuse & Co. were approximately 37% of the total trading. The price of the stock rose in the first period from $1⅝ to 3¾, and in the second period it rose from 2¾, on March 7, to a high of 4⅛ on March 23, 1936. This large amount of trading by Minuse & Co., accompanied by rising prices resulted in publicity and stimulated the public to enter the market. One of the methods by which manipulation of the market was promoted by Minuse & Co. was by "wash sales" in which the ownership of the stock did not change; another was by matched purchases and sales, i. e., orders given for a purchase with the knowledge that other persons would give orders for sales in substantially the same amounts at about the same time. Various persons acting as dummies for Minuse & Co. were told to buy the stock while at the same time Minuse & Co. would sell. Likewise the defendants would agree with purchasers to guarantee them against loss, would pay customers men to advise their customers to purchase the stock and would send out literature recommending the investment and suggesting a prospective rise in the market price to $8 or $10 per share.

Minuse & Co. could not unload their option stock at a profit unless there was a large rise in price from that of $1⅝ in October, 1935. Evidence was introduced indicating that to create the appearance of a rising market and to attract the interest of the public, so that the option stock could be disposed of, Minuse & Co. manipulated the market by using dummy accounts, "wash" and "matched sales" and by giving it the appearance of great activity.

Both defendants have appealed. In spite of the very strong case presented against them, we are constrained to hold that they did not get a fair trial and that accordingly the judgment must be reversed.

Pelletier makes the claim that he had no connection with the conspiracy charged, but he was a partner in Minuse & Co., was present at the time of the negotiations of Minuse to acquire the option from Levy

for the 73,000 shares, was also present when Minuse was directing an employee Cappi to purchase 2,500 shares of Tastyeast stock through a brokerage house and was at the same time putting in an order to sell a like amount. After the transaction Pelletier thanked Cappi for "putting it through." Pelletier came to the office daily, drew money as a partner, paid Stuart and Cappi, and by his personal checks paid customers men for advising the purchase of stock and paid ⅛ of a point per share to speculators as a guaranteed profit for purchases in the market.

■ While certain explanations consistent with innocence were offered, the guilt or innocence of Pelletier was clearly for the jury.

■ Coming to the trial, we regret to say that serious prejudicial error was committed in allowing the government to show that Trezise, who had loaned Tastyeast stock and cash to Minuse & Co., had embezzled $130,000 from the First National Bank of Weatherly, Pennsylvania, of which he was cashier, and apparently had diverted a part of his embezzlements, or their proceeds, to Minuse & Co. He was called as a witness by the government and cross-examined in regard to his defalcations. We can see no reason for this other than to show that he was a crook and thereby throw discredit on the defendants for associating with him. Doubtless the government could properly show that Trezise was a backer or customer of Minuse & Co., who helped them to finance their stock manipulations, but there was no justification for asking him, particularly on his direct-examination, about his crimes. Such testimony was in no way calculated to support the government's case nor permissible upon the theory that he was a hostile witness or had surprised his interrogator. The error was greatly emphasized by the long cross-examination of Minuse by the trial judge in respect to the relations of Minuse & Co. with Trezise. There was no proof that either of the defendants knew that the money and securities they received from Trezise were derived from embezzlements and the whole matter seems to have been both irrelevant to the issues and highly prejudicial to the defendants. At one time when the court was asking Minuse about the advances from Trezise and had tentatively computed them at $66,-000, he characterized the $66,000 as "got from this $50 a week cashier." This characterization was naturally objected to by Minuse's attorney. Immediately thereafter Minuse was asked:

"Q. What are you doing? Sparring with me?

"Mr. O'Connell: If your Honor please, may I have my exception?

"The Court: Yes, you can have your exception, sir. Just take them right along. I have some duties to perform here. I have asked this witness to answer directly and he is not complying with my request. You can take an exception to that too.

"Mr. O'Connell: I take an exception."

■ We think the trial court also erred in refusing to allow Pelletier's counsel to ask the witness Monahan (an expert on Wall Street practice called by the government) whether it does not frequently happen that "a brokerage firm that is actively trading in stock very often buys its own stock." This seems to have been a fair question. To convict the defendants, it was necessary to prove that they intended to manipulate the stock market. The crossing of orders resulting from active buying and selling without such intention would not violate the law. The exclusion of the evidence was improper and certainly did not justify the comment: "Well, does the fact that a man commits a burglary make any difference if you ask a witness if there weren't nine other men who committed the burglary. Each man stands on his own. Take an exception."

In other instances the court exhibited unreasonable impatience with defendants' counsel and failed to maintain that detached and impartial attitude which is necessary to preserve a proper atmosphere and to insure a fair trial. Furthermore, there plainly was no justification for the constant interference by the court with counsel in their attempt to examine their witnesses. It did not expedite matters for the judge to take over such a large proportion of the examination and imposed unmerited burdens.

Judgment reversed.

Before he resigned, Judge PATTERSON heard the argument of this appeal, and voted at the conference to reverse the judgment. Since his resignation he has read this opinion and authorizes us to say that it accords with his views.