**UNITED STATES v. AARON et al.**

No. 208, Docket 21940.

United States Court of Appeals
Second Circuit.

Argued March 15, 1951.

Decided June 20, 1951.

Eugene A. Sherpick, John McKim Minton, New York City (Eugene A. Sherpick, John McKim Minton and Richard T. Davis, all of New York City, of counsel), for appellants.

Irving H. Saypol, U. S. Atty. for the Southern District of New York, New York City (Bruno Schachner, Albert A. Blinder, Robert M. Reagan and Florence P. Shientag, Asst. U. S. Atty. all of New York City, of counsel), for appellee.

Before SWAN, CHASE and FRANK, Circuit Judges.

CHASE, Circuit Judge.

During the years 1941 and 1942, appellant Aaron and his stepson, appellant Freidus, were in partnership with their wives doing business in the city of New York under the firm name of Aaron Machinery Company. The partnership business, which was conducted by the appellants, was that of buying and selling second-hand machinery which was in great demand at that time, and the purchases and sales were extensive. Adequate books of account were kept but it was proved, without dispute, that not all of the receipts from sales were entered in them. Ordinarily, consecutively numbered invoices were sent to purchasers and the payments received entered in the books to be used in the computation of taxes due the government. But whenever the appellants saw fit to depart from this practice an unnumbered invoice was used to cover a sale, and when this was done the payments received were not entered upon the partnership books or deposited in the active banking account of the partnership. Instead, they were deposited in three other banks in each of which an account was carried in the name of the partnership. Records of these accounts were in charge of an employee maintained at the address where the partnership had formerly had its principal office and place of business, but no record of them was kept at the current principal office of the partnership. It was shown that during the two years above mentioned sales approximating $282,942 were not carried into the partnership books but were by the appellants diverted to these secret bank accounts and eventually withdrawn by the partners untaxed. By so doing the appellants, so the government contended, attempted to defeat and evade taxes due the United States from themselves and their wives.

The defense was that the distribution of these secret deposits to the partners resulted in no taxable income because the proceeds were used for deductible business expenses of two kinds.

One was the repayment to the partners of $105,000 which they had advanced to the partnership and for which it was indebted to them at the beginning of the two-year period here involved; the other was the purchase of machinery which could be obtained only for cash. In further explanation of this method of conducting part of the business the appellants, both of whom testified in their defense, undertook to prove that they so acted under the advice of their accountant to avoid tax problems which might otherwise arise, though the accountant, called as a witness for the government, denied that.

The sufficiency of the evidence to support the verdict is unquestioned, but the appellants rely for reversal upon what they say are three trial errors. The one most earnestly pressed is the misconduct of the trial judge, and the others are an attempt by the prosecutor to introduce an inadmissible exhibit during the cross-examination of a witness for the defense and the reception of the testimony of a witness for the government as to something which could not have been within her actual knowledge.

The conduct of the judge which the appellants insist is reversible error was what is said to have been his unjustifiable interruption of counsel's examination of witnesses and his interrogation of them too frequently and at too great length, the greatest stress being placed upon his so do-

ing while each of the appellants was testifying. This, coupled with his display of skepticism as to their veracity and on one occasion his actual expression of his disbelief of the testimony of a defense witness, is said to add up to reversible error.

■■■ It would serve no purpose now to repeat in substance the numerous admonitions which appellate judges have written for the guidance of trial judges on this subject. If reference to some of them isn't enough it is difficult to comprehend how a multiplication of words in like vein would help. See United States v. Marzano, 2 Cir., 149 F.2d 923, 926; United States v. Minuse, 2 Cir., 114 F.2d 36; Gomila v. United States, 5 Cir., 146 F.2d 372, 374; Williams v. United States, 9 Cir., 93 F.2d 685; Adler v. United States, 5 Cir., 182 F. 464. As these cases well show, there have been times when judges have so overstepped the bounds of judicial propriety that reversals on that account have followed conviction. On the other hand it seems equally needless now to deal, except by reference to some of the cases, with the right, indeed the duty in the exercise of a wise and just discretion, of trial judges to act in the interrogation of witnesses and otherwise to the end that trials will not be mere contests in forensic skill between opposing attorneys, but that the truth shall emerge so far as possible and be given its full legal significance in the judgment. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Simon v. United States, 4 Cir., 123 F.2d 80, 83; Kettenbach v. United States, 9 Cir., 202 F. 377, 385. Nor is an apparently needlessly great number of questions asked by the judge error *per se*. Each instance of the questioning on review of the conduct of the trial judge will present its own problems, and in their solution the overriding consideration should be whether the judge saw to it that in the end the jury had before it all, and only, the admissible evidence produced, and that it was given to understand that it was free to find the facts as in its collective judgment the evidence showed them to be.

■■ Judged by that standard we think the trial judge did not fall into error. Much of the fault found with him concerns what did not occur within the presence or knowledge of the jury. That which did needs no additional comment except to note that after the questioning by the court of one of the appellants' witnesses, Rosen, the judge remarked "I do not believe this testimony at all." Thereupon the appellants' trial attorney stepped to the bench and moved for a mistrial, though not within the hearing of the jury. This motion was denied as were other motions, each made outside the hearing of the jury, whereby the issue of the conduct of the judge was raised. Appellants' attorneys were throughout the trial understandably reluctant to object before the jury. When this motion was made the judge was not requested to, and did not, tell the jury at once that his opinion so expressed should be disregarded. But in his charge, which was, however, not delivered until seventeen days later, he did do so and advised the jury as follows:

"In our system of jurisprudence, there is a complete line of demarkation between the duties of the judge, on the one hand, and those of the jury, on the other. It is my function to set forth the rules of law which govern the case. * * *

"On the other hand, you are the sole and exclusive judges of the facts and the exclusive judges of the credibility of the witnesses.

"I will refer later to the meaning of 'credibility of witnesses.' If, during the course of the trial, I made any statements that may have indicated to you that I have an opinion as to the ultimate facts in this case, you are to disregard them. They are not binding on you, because, as I have stated, you are the exclusive judges of the facts and the credibility of the witnesses.

"On one occasion I did make a comment with respect to the testimony of the witness Louis Rosen. You are to disregard that comment made by me because, as I have indicated to you, you members of the jury are the exclusive judges of the facts and are the sole judges of the credibility

of the witnesses who have appeared before you and, in the last analysis, the responsibility is yours to decide those facts and to render your verdict accordingly.

"During the trial I have addressed questions to some of the witnesses and have made statements to counsel. Such questions as were asked by me were for the purpose of eliciting facts to aid you in your deliberations. If any of you have formed any impression that I accentuated certain facts elicited, you must put that completely out of your minds. All facts were elicited for the purpose only of aiding you in your deliberations and were not intended to be, nor are they any expression by me on the facts or the credibility of any of the witnesses."

Despite the time lapse between the occurrences of which complaint is made and the charge, we think the jury was so clearly told that its own judgment of the force and effect of the evidence should be its sole basis for decision as to the facts that no reversible error appears. Moreover, while Freidus was testifying the judge twice called the attention of the jury to what was thus covered more fully in the charge. On the first occasion, after eliciting by his questions facts which had a tendency to show that the witness had used questionable business practices, the judge limited the facts so brought out to the issue of the credibility of the witness and defense counsel accepted that as "very satisfactory." Later, the witness, who had gone to college, testified that he understood the word "property" as used in a questionnaire he had filled out to mean "a building or a house or land." The judge commented, "Our colleges do not do a very good job apparently." He then continued by saying that no opinion of his was binding on the jury and that, "The jury at the conclusion of this case will be instructed that they are the sole judges of the fact[s] and the credibility of all the witnesses." It has long been the law that in a federal court the judge "has the authority to interrogate witnesses, and to express his opinion upon the weight of the evidence and the credibility of the witnesses." Kettenbach v. United States, supra, 202 F.

at page 385. But of course the jury should be made to understand, as we think it was here, that it was in no way bound by any observations of the court.

The second point relied on concerns an episode in the cross-examination of appellant Freidus. He had testified that in 1941 he had borrowed $25,000 from his grandfather, Samuel Selinsky, and his great grandmother, Ida Selinsky. It had been shown that appellant Aaron had in a Selective Service questionnaire listed Samuel Selinsky as a dependent. Freidus was asked if he knew that a Robert Selinsky, his maternal uncle, had also listed them as partial dependents and replied, "I do not know." Asked whether Robert Selinsky had listed them in his Selective Service affidavit in November, 1943, as the recipients of old age pensions he said he did not know. Both answers were received over the objection of counsel for the appellants. Later in rebuttal the government called the assistant chief of records for Selective Service in New York City. She produced the file of Robert Selinsky and the assistant district attorney had it marked for identification. Then the witness was asked to examine it and to state "who are the relatives of Robert Selinsky?" An objection to this was sustained. The next question was, "Is Becky Aaron listed as a relative of Robert Selinsky?" When objection was made the judge said, "Sustained. And please do not refer to the paper again, Mrs. Shientag. Do not refer to the contents of the paper." The obvious purpose of the prosecutor was to show that the grandparents of Freidus did not in 1941 have $25,000 to lend him as he said they did. It seems, from what then occurred at the bench where the prosecutor persisted in offering the paper, that she thought it was, by thus being filed with the government, made admissible as independent evidence of the financial inability of the Selinskys to make the loan to which Freidus had testified. The judge explained to her that she was wrong and there the matter ended. We think the mere statement of what happened provides a sufficient answer to the contention that reversible error occurred. The district

attorney was apparently acting in good faith but upon the mistaken notion as to admissibility above mentioned.

■ ·The last point relates to the calling of the widow of Stanley Selkowsky in rebuttal. The appellants had testified, in accounting for the business use of the money which had been received by the partnership and not entered in the regular books of account, that they had used $30,000 to pay Stanley Selkowsky for a purchase of machinery from him. Mrs. Selkowsky testified that until her husband died in May, 1941, he dealt in used machinery, having his place of business in an old blacksmith·shop in Secaucus, N. J., over which they lived with their three children and that about a third of the space in the shop was taken up by a bin in the back in which they kept coal and wood for household use; that he kept sales books; that he billed purchasers for machinery which he sold; that she wasn't in the business with him but looked after it for him at times when he was not in the shop; that after he died she continued the business herself for a while, though when she testified she was a maid in a hotel at Miami, Fla. She was asked, "Now, Mrs. Selkowsky did your husband ever receive $30,000 in cash?" Over objection she was permitted to answer "No, he did not." She stated further that she was positive that he did not and under further questioning both by the assistant district attorney and by the court testified that her husband had a small business; did the work without any employed help; had not had a very large amount of machinery at one time during the few months before his death; and did not have $30,000 in machinery in 1941. On cross-examination she was asked, "Well, how would you know about a deal that took place if you were not present?" And she answered "My husband would tell me about it. He would tell me everything."

It seems obvious that it must have been apparent to the jury that this widow did not know as positively as she testified she did that her husband had never made a sale of $30,000 worth of used machinery.

But her testimony did show, if believed, that she had personal knowledge of him and of the size of his business sufficient to put such a sale beyond reasonable probability. To think for a minute that the jurors listening to her would give it any more weight than that would seem to be a gratuitous denial of their possession of ordinary common sense.

Judgement affirmed.