## UNITED STATES v. BRANDT et al.

### No. 206, Docket 22280.

United States Court of Appeals
Second Circuit.

Argued April 7, 1952.

Decided May 9, 1952.

Bernard Tompkins, New York City, for defendant-appellant Joseph L. Brandt.

Milton H. Spiero, New York City (Abraham J. Brill, New York City, on the brief), for defendant-appellant Sidney Greenberg.

Robert M. Reagan, Asst. U. S. Atty., of New York City (Myles J. Lane, U. S. Atty., and Thomas F. Burchill, Jr., Leonard Maran, and Stanley D. Robinson, Asst. U. S. Attys., all of New York City, on the brief), for plaintiff-appellee.

Before CHASE, BIGGS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Defendants-appellants Brandt and Greenberg and defendant Cancer Welfare Fund, Inc., are charged with violating 18 U.S.

C.A. § 1341 in using the mails to carry out a scheme to defraud and to obtain money by false pretenses. A trial to the jury resulted in a verdict of guilty, and the court sentenced the individual defendants to terms of imprisonment. They now appeal.

From the testimony adduced, it appears that sometime in 1949 appellants, previously associated with a charitable organization devoted to rendering financial assistance to victims of cancer, decided to institute a similar program of their own, the Cancer Welfare Fund, Inc. Thereafter organizational meetings were held with certain others interested in the plan and a charter and bylaws were drawn up. Appellants also secured permission to list a number of prominent people as officers or national sponsors on the solicitation literature. Brandt was made Executive Director at a salary of $150, later $200, a week and acted in this capacity as the guiding spirit of the organization. Greenberg formed the Empire Campaigns, Inc., which was then retained by Cancer Welfare, to solicit funds on a 30 per cent commission basis. Both organizations occupied space rented in the Empire State Building for over $1,000 a month.

After borrowing some $15,000 apparently required to finance the drive, the enterprise began its program of soliciting funds from the general public. This was done by mailing requests for donations, accompanied by a brochure illustrating various services to cancer victims and their families which the organization was to carry on. But in fact performance fell far short of expectation. By the end of 1950, the Fund had collected some $123,-000 through its mail campaigns, but only $7,349.06 had been expended on the advertised assistance. The remainder was eaten up by rent, printing expenses, salaries, and the repayment of the various loans which at one time had reached $60,-000 and to which had been pledged a substantial portion of current contributions. In December, 1950, Cancer Welfare was discontinued.

From this background of facts, substantially undisputed, it is apparent that the question of appellants' guilt must turn in the main upon their intent in making the representations to the public that the funds were to be used to supply the needs, "medical as well as financial," of cancer victims. Thus the good faith of these appellants in making the rather extensive claims of charity which were not borne out in the event was the crucial issue for the jury to resolve. There was obviously substantial evidence to take the case to the jury, as, indeed, only Greenberg questions. The real issue of this appeal arises upon appellants' contention that they did not have a fair trial because of both the judge's conduct during its course and the nature of his charge to the jury. We are constrained to hold that these contentions are well taken and that there must be a retrial. We are not called upon to determine which, if any, of the incidents alone might vitiate the result; the cumulative effect, however, was such that the verdict cannot stand.

■ A trial judge conducting a case before a jury in the United States courts is more than a mere "moderator," Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321; Montrose Contracting Co. v. Westchester County, 2 Cir., 94 F.2d 580, 587, certiorari denied Westchester County v. Montrose Contracting Co., 304 U.S. 561, 58 S.Ct. 943, 82 L.Ed. 1529, but he is decidedly not a "prosecuting attorney," United States v. Guertler, 2 Cir., 147 F.2d 796, certiorari denied 325 U.S. 879, 65 S.Ct. 1553, 89 L.Ed. 1995; Hunter v. United States, 5 Cir., 62 F.2d 217, 220. He enjoys the prerogative, rising often to the standard of a duty, of eliciting those facts he deems necessary to the clear presentation of the issues. Pariser v. City of New York, 2 Cir., 146 F.2d 431. To this end he may call witnesses on his own motion, adduce evidence, and himself examine those who testify. See United States v. Marzano, 2 Cir., 149 F.2d 923; Guthrie v. Curlett, 2 Cir., 36 F.2d 694; Young v. United States, 5 Cir., 107 F.2d 490, 493; 3 Wigmore on Evidence § 784, 3d Ed. 1940. But he nonetheless must remain the judge, impartial, judicious, and, above all, responsible for a courtroom atmosphere in which guilt or innocence may be soberly

and fairly tested. Because of his proper power and influence it is obvious that the display of a fixed opinion as to the guilt of an accused limits the possibility of an uninhibited decision from a jury of laymen much less initiated in trial procedure than he. He must, therefore, be on continual guard that the authority of the bench be not exploited toward a conviction he may privately think deserved or even required by the evidence. United States v. Minuse, 2 Cir., 114 F.2d 36; Martucci v. Brooklyn Children's Aid Soc., 2 Cir., 140 F. 2d 732; United States v. Marzano, 2 Cir., 149 F.2d 923.

■ In the case at bar this mandate of judiciousness appears to have been breached on unfortunately more than a single occasion. Thus the examination of witnesses and discussions with counsel by the court were spotted with a number of remarks which were not of the form to elicit information or direct the trial procedure into proper channels, but rather to cut into the presumption of innocence to which defendants are entitled.[1] Beyond this the court actively cross-examined several witnesses, notably the defendant Brandt himself, to a quite unusual extent. This interrupted the orderly presentation of evidence by the defense. But further the questioning appeared mainly to underline inconsistencies in the positions,[2] or to elicit admissions bearing on the credibility,[3] of defense witnesses.

■ The government insists on the curative effect of the charge, in which the jury was admonished that its own view of the evidence controlled, citing the similar case of United States v. Aaron, 2 Cir., 190 F. 2d 144, certiorari denied Freidus v. United States, 342 U.S. 827. Such admonitions may offset brief or minor departures from strict judicial impartiality, but cannot be considered sufficient here. For the 900 questions asked by the court during this eight-day trial present far more examples of serious incidents. The cumulative effect of these we are unable to hold cured by the formal charge given.

Passing now to the court's charge to the jury, the court declared "totally immaterial" evidence—which it had earlier refused to admit—that a number of reputable charities retained professional fund raisers on a contingent basis, similar to the ar-

---

1. While particular incidents are not to be overstressed apart from their context, the following may serve to illustrate the general atmosphere. Thus one of the defendants was accused of "stage play" in his testimony. To another, also favorable to the defense, it was observed: "You remember a lot this afternoon that you didn't remember this morning, Mr. Telchin, don't you?" Counsel for defense, inquiring as to the substance of the discussions during the early organization meetings, was asked, "Are you attempting to prove that they believed in virtue, is that it?"

2. Thus when Brandt, asked on direct examination if he had intended to misrepresent by mailing the crucial brochure advertising certain services to cancer sufferers, answered in the negative, the court interposed to ask him a series of 24 detailed questions on the possibility that these services might or could be rendered, "to find out what this witness is talking about." At that time the prosecution was not yet entitled to cross-examine the witness on the matter.

3. Thus, referring to a communication in which Brandt claimed to be setting aside 60% of the contributions for the advertised services—not part of the campaign literature and hence not one of the fraudulent misrepresentations alleged—the court subjected Brandt to an extensive examination on the matter, ending thus:
"Q. Does that correctly record what you told Dr. Simard? A. I believe it would be.
"Q. Were those statements true at the time you made them? A. No, sir, your Honor, they couldn't have been true.
* * *
"Q. You made the statement? A. I did.
"Q. That is set out in this Exhibit 18? A. Yes, your Honor.
"Q. You say that it was untrue; is that right? A. Yes.
"Q. You say now that you were under great stress and you made a mistake; is that it? A. I must have been, yes.
"The Court: Go ahead."
See American Motorists Ins. Co. v. Napoli, 5 Cir., 166 F.2d 24, 26, 27; Williams v. United States, 9 Cir., 93 F.2d 685; Hunter v. United States, 5 Cir., 62 F.2d 217, 220.

rangements disclosed in the testimony here. It also stated that the fact that the appellants had not themselves profited was "not at all material." And finally it informed the jury that it had refused defense counsel's request to charge on the import of certain honest disclosures appellants had made during an investigation by the postal authorities in May, 1950, "because it is not the law."

■ Culpable intent or lack of good faith is not merely an element of the crime of fraudulent use of the mails, United States v. Ballard, 322 U.S. 78, 82, 64 S. Ct. 882, 88 L.Ed. 1148; Sandals v. United States, 6 Cir., 213 F. 569; it is in fact practically crucial where as here the scheme and the mailing are admitted. United States v. Freeman, 7 Cir., 167 F.2d 786, 790, certiorari denied Freeman v. United States, 335 U.S. 817, 69 S.Ct. 37, 93 L. Ed. 372. And hence, since it may be only inferentially proven, 2 Wigmore on Evidence §§ 300, 302, 3d Ed. 1940, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have.

■ Here the disclosure to postal authorities, though perhaps not entitled to much weight, at least tells something of appellants' intentions. United States v. Littlejohn, 7 Cir., 96 F.2d 368, certiorari denied Littlejohn v. United States, 304 U.S. 583, 58 S.Ct. 1058, 82 L.Ed. 1545. The fact that other charities hired professional fund raisers certainly indicates that the idea was not a new one with appellants in view of their long associations with such organizations and their familiarity with generally accepted operational practices in fund raising. And the failure to profit personally, though not conclusive, establishes something of the nature of their attitudes toward the campaign. Certainly evidence that both planned to use the scheme solely for personal gain without even a gloss of altruism would have been both directly admissible and extremely unfavorable to their position. Conversely the jury should be entitled to weigh the importance of a contrary attitude on their

196 F.2d—42

part. United States v. Buckner, 2 Cir., 108 F.2d 921, certiorari denied Buckner v. United States, 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016; Coleman v. United States, 5 Cir., 167 F.2d 837; United States v. McNamara, 2 Cir., 91 F.2d 986, 992.

We therefore conclude that in its treatment of this type of evidence, both as to its receipt and as to its effect as discussed in the charge, the court committed reversible error. In view of this conclusion we think it unnecessary to discuss other contentions of bias, improper emphasis, and undue limitation of the issues before the jury. In the light of our opinion herewith, similar problems are not likely to arise as a consequence of the retrial.

Reversed and remanded.