**UNITED STATES v. TRAMAGLINO et al.**

**No. 259, Docket 22364.**

United States Court of Appeals,
Second Circuit.

Argued May 15, 1952.

Decided June 30, 1952.

Myles J. Lane, New York City (Thomas F. Burchill, Jr., and Harold J. Raby, New York City, of counsel), for United States.

Nicholas P. Iannuzzi and Ralph J. Barra, New York City (Peter L. F. Sabbatino, New York City, of counsel), for Tramaglino.

Samuel Segal, New York City, for Rosario.

Before SWAN, Chief Judge, and AUGUSTUS N. HAND and FRANK, Circuit Judges.

FRANK, Circuit Judge.

1. Both appellants contend that no single conspiracy was proved between them and other defendants (not appealing here)

who were named as co-conspirators in the indictments and were tried together with these appellants in the district court. The appellants made timely motions below to dismiss the conspiracy count. As a basis for discussing their argument, we will summarize the evidence elicited at trial from which the jury might have found them guilty of conspiring with the other defendants.

Beginning in May 1950, Rosario, through the medium of one Mejia, made several sales of marihuana to Perez who, together with some of the other defendants tried below, was a member of a "syndicate" to buy and resell marihuana at a profit. Rosario, according to the testimony of Perez, was told that the marihuana was being bought for a "corporation" which included Alvarez, Zayas and others, and that Perez himself was "making nothing on the deal." From this testimony the jury might reasonably have inferred that Rosario knew that the marihuana he sold was intended for resale by the "corporation." In fact, Rosario himself, a few months later, bought heroin from Alvarez, a member of the same syndicate to which Rosario had sold the marihuana. When Rosario's supply of marihuana ran out, and he went to Texas for more, the syndicate sought a new supplier. Alvarez suggested Tramaglino, some of whose marihuana he had on hand. Several sales were made by Tramaglino to Alvarez through one Rodriquez. Tramaglino was informed by Alvarez that the marihuana was for resale. He also knew that Zayas, and his paramour, Ida Batista, were involved in the sales since Zayas' money was openly used to pay Tramaglino.

■ Here then we have evidence of several sales, at different periods, by Rosario and Tramaglino, of marihuana to the same group of buyers with knowledge on the part of the two suppliers that several conspirators were involved in the purchases and that the purchases were for resale. This was enough, we think, to show that each appellant, as supplier, participated in, and acted to further the ends of, the conspiracy. It did not matter that neither had dealings with one another; each performed the same role at successive stages

for the same ends. The overall conspiracy was the plan conceived by the intermediary group—Alvarez, Zayas, and their fellows—to buy and resell marihuana at a profit. Both Rosario and Tramaglino knew and participated in this plan by furnishing the essential ingredient—the marihuana. In United States v. Bruno, 2 Cir., 105 F.2d 921, 922, a case quite similar to this one, we said, in affirming a conviction of smugglers, middlemen, and retailers, for a single conspiracy to import and distribute narcotics illegally: " * * * the smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators, at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers. That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole." In later cases, we have not hesitated to hold as a conspirator a steady supplier in large amounts of narcotics or other contraband to a group which, to the knowledge of the supplier, intended to use the object illegally. United States v. Koch, 2 Cir., 113 F.2d 982; United States v. Todaro, 2 Cir., 145 F.2d 977; cf. United States v. De Vasto, 2 Cir., 52 F.2d 26, 30, 78 A.L.R. 336.

■ The defendants invoke our decision in United States v. Falcone, 2 Cir., 109 F.2d 579, for the proposition that a mere supplier, even one who knows of the illegal purpose of his purchaser, cannot be held as a co-conspirator. We have limited that case to its strict facts—the case of a supplier of goods, innocent in themselves, who does nothing but sell those goods to a purchaser who, to the supplier's knowledge, intends to and does use them in the furtherance of an illegal conspiracy. The suppliers here did more than just sell. They aided and abetted the conspiracy by themselves making illegal sales; for their

sales were not on the basis of the proper forms or pursuant to written orders of the type required by 26 U.S.C. § 2591(a) for marihuana transfers. As these sales were illegal and clandestine, each supplier, through them, became himself a part of the conspiracy for their intended resale; this added element of personal law-breaking and clandestine selling furnished the required "stake in the success of the venture" that the Falcone case demanded. So we have held in United States v. Pecoraro, 2 Cir., 115 F.2d 245, and United States v. Loew, 145 F.2d 332, 333. In the Pecoraro case, we said, about an "anti-freeze" denatured alcohol dealer who furnished his product to distillers and failed to report the sales per regulation: "To report the sales would have stopped the business, both the business of Gross with the distillers, and presumably any operation of the still; and to suppress the sales was therefore to assist the distillers in their distilling. It is of course true that Gross' motive was only to get his profits from the sales, but his guilt does not touch upon his motive. In order to secure the business he had to abstain from disclosing the distillers' business, that is, himself to commit a crime and expose himself to punishment. That was to take an active hand in the distillers' business, and to have a stake in their

venture in a sense that an indifferent seller has none." The suppliers' stake in the illegal enterprise here was of a similar, but even a stronger, nature, and certainly sufficient to make them co-conspirators with their purchasers.

2. The second major alleged error concerns the trial judge's refusal to read, or allow defense counsel to read, a "case report," prepared by Narcotics Agents from the pre-trial testimony of Ida Batista, an informer, and from the testimony of other witnesses, containing also observations of the agents working on the case. Defense counsel wished to see this "report" in order to ascertain whether statements made by the witness Batista conflicted with her trial testimony. The government attorney, upon defense counsel's request, explained that at no point were the witness' statements taken down verbatim for inclusion in the case report. He offered, and did produce, the only written signed statements of the witness made before trial. The trial judge read these statements in the presence of defense counsel and asked them if the defendants were satisfied. Their conduct showed they were. Their counsel did not object or pursue their request for the case report after the government had explained its contents and the judge rule that it was not material.[1] Ac-

1. The colloquy between the judge and counsel in re the production of the case report is as follows:

"Mr. Cohn: What would your Honor want me to give to you?

"The Court: Well, you submit to me her signed statement, the one she made in August.

"Mr. Cohn: In July or August. I think it was in July, your Honor.

"The Court: Yes. Nothing has been said about the Grand Jury minutes so that I haven't that request before me. So far as the case report made by the agents, which you say is based upon statements made by this witness and other witnesses and is not in question and answer form—

"Mr. Cohn: No, it is not.

"The Court: That is not material.

"Mr. Cohn: Very well, your Honor. We will submit a copy of that statement.

"The Court: Of the signed statement?

"Mr. Cohn: Yes, sir, your Honor.

"The Court: I will look it over.

"Mr. Cohn: Surely.

"The Court: Now, is that all, Mr. Altman?

"Mr. Altman: I wanted to speak to you, if your Honor pleases, on an entirely different matter. * * *

"The Court: Well, we were just about 35 minutes or a little more here at the bench and I want to state on the record what took place in that time. The attorneys for the defendants were here, also Mr. Cohn, the Assistant United States Attorney, and Mr. Olivera, the Narcotics Agent. In their presence I went over with the attorneys, page by page, all references to any transactions or incidents in which any named defendant was mentioned, and where I found any such name I read the paragraph or the few sentences in relation to that incident or transaction. And then I asked counsel if they wished to make use of any part of what I just read and I was informed that they did not. I also read, in the presence of all counsel, at their re-

cordingly, we need not consider whether, absent such an acquiescence, the judge's conduct would have been erroneous.

■ 3. Defendant Tramaglino alleges as reversible error in the answer of the witness Alvarez on cross-examination that, in 1947, Alvarez had been buying heroin for resale from Tramaglino. This date was outside the period named in the indictment and did not directly pertain to any crime charged. Although Tramaglino's lawyer did not object when this answer was given, he shortly thereafter asked for a mistrial which the judge denied. Inadmissible evidence like this might well be prejudicial and pivotal in a close case. Here there was little question but that it was inadvertent; it was elicited by a defense counsel (Rosario's lawyer) and not by the government; it came as a result of the defense's probing of the pre-indictment criminal record of the witness, a course also pursued by Tramaglino's lawyer.[2] Nonetheless it was error, even if inadvertent, and we must therefore rest our conclusion that it was not prejudicial on the ground that the other evidences of Tramaglino's guilt in the case were so strong that it is unbelievable that a rational jury would have acquitted if this error had not occurred. See Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L. Ed. 185; United States v. Broxmeyer, 2 Cir., 192 F.2d 230.

■ 4. Defendants say that the trial judge should have instructed the jury on the alibi defenses of Rosario and Tramaglino, and on the circumstantial nature of the evidence against them. They made no such requests, and it has been held in Goldsby v. United States, 160 U.S. 70, 16 S.Ct. 216, 40 L.Ed.

343, and Kastel v. United States, 2 Cir., 23 F.2d 156, that these specific matters need not be mentioned in the charge without proper requests. See also United States v. Capitol Meats, 2 Cir., 166 F.2d 537–538; United States v. Corry, 2 Cir., 183 F.2d 155, 157–158; United States v. Newman, 2 Cir., 143 F.2d 389.

■ 5. Defendants have other objections to their convictions on the substantive counts of purchase and sale, most of them pertaining to the contradictory and unreliable testimony of the government's witnesses. Suffice it to say that the jury had the job of judging witnesses' credibility. We cannot tamper with their conclusions on that issue. Tramaglino objects to the various versions, by different witnesses, of the dates on which he is supposed to have committed the sale offenses, and argues that he could not adequately prepare an alibi defense when the dates were constantly changing from those specified in the indictment. Our decision in United States v. Wilson, 2 Cir., 154 F.2d 802, 805, requires only "substantial similarity" between the indictment dates and those brought out in trial; all the versions here were within a few weeks of one another and of the indictment dates. Alvarez' testimony that he bought marihuana from Tramaglino before May 1950 was elicited in deliberate questioning by Tramaglino's lawyer himself, and cannot now be cited as prejudicial error. The "corpus delicti" of the sale-and-purchase offenses was adequately proved by the testimony of the drug addicts based on their sight and taste that the stuff bought and sold was really heroin or marihuana. Moreover, drug addicts paid good money

quest, the part of the statement that related to the arrest of Ida Batista and what followed thereafter. I also called to the attention of the representative of the Legal Aid Society that part of her statement which referred to the time when she first moved into the apartment at West 112th Street. I also read the concluding two statements of the statement that has at the top a legend describing it as a statement made on July 17, 1950, but which I have been told by Mr. Cohn, also in the presence of defense counsel, covers certain incidents and

events after that date of July 17, 1950.

"The statement, as I said before, was unsigned. Does that comply with the request of defense counsel?

"Mr. Moldow: It does, your Honor.

"The Court: Completely?

"Mr. Solomon: Yes, sir."

2. The trial judge offered to counteract the slip by an instruction to the jury to disregard it but defense counsel (understandably) declined on the ground that a disregarding instruction would only serve to drive the evidence deeper into the jury's mind.

over a period of time for this stuff. Some of the marihuana sold by both Rosario and Tramaglino and subsequently bought by government agents was actually analyzed as such by laboratory experts. In short, the proof sufficed on all counts that the forbidden drugs were involved. See United States v. Adelman, 2 Cir., 107 F.2d 497; Pennacchio v. United States, 2 Cir., 263 F. 66.

Judgments affirmed.