## UNITED STATES v. GIALLO et al.

No. 258, Docket 22675.

United States Court of Appeals
Second Circuit.

Argued May 15, 1953.

Decided Aug. 20, 1953.

Henry K. Chapman, New York City, for appellants Giallo and Valenti.

Harold J. McAuley, New York City, for appellant Juliano.

J. Edward Lumbard, Jr., U. S. Atty., Southern District of New York, New York City, for appellee; Thomas F. Burchill, Jr., Harold J. Raby, Asst. U. S. Attys., New York City, of counsel.

Before CHASE, CLARK and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The three appellants were convicted after a trial by jury on an indictment charging them with having conspired, contrary to Title 18 U.S.C. § 371, to violate several sections of Title 26 U.S.C. More particularly, the first count, on which they were convicted, charged them with having conspired to operate a distillery, to manufacture distilled spirits without giving bond and to transport distilled spirits in non-tax-paid containers.[1]

Since the sufficiency of the evidence against the appellants is not questioned, the facts shown at the trial need be related only briefly. Treasury agents testified that they observed that appellants Giallo and Valenti had for a considerable time been sending quantities of sugar periodically from New York City to the vicinity of Kingston, N. Y., in a green-colored truck. The destination of the truck was finally traced to a farm in that vicinity owned by appellant Juliano; and, on February 15, 1950, having obtained a valid search warrant, the agents searched those premises. They discovered a still set up and operating with the usual appurtenances for the distillation of spirits and arrested men working there, none of whom were the appellants. They also seized the green truck above mentioned as it was approaching the farm. Since nothing turns upon the nature of the evidence of Giallo's and Valenti's participation in the conspiracy, no outline of that is necessary.

Appellant Juliano, the owner of the farm, testified that he had been a carpenter and garage mechanic prior to buying the farm in 1946. From that year until September 1949 he lived with his wife and three children at the farm and tried to operate it; but that venture turned out unsuccessfully and he left for West Berlin, N. Y., to live in the home of a brother-in-law, leaving his tools and some other personal property at the farm. Juliano found work and went back to his farm in December, 1949, to get some of his tools. He testified that while there he met a man he didn't know but who identified himself by handing him a card with "Giallanno Trucking" printed on it. The stranger said that he was in the trucking business in Kingston and, needing storage space for trucks and his car, inquired whether he could rent the house and barn. Without learning more about the man, Juliano rented the buildings to him for $65.00 a month and received payment for a month's rent.

After that Juliano returned to the farm a few times to get more tools. He testified that he was on the way there on February 15, 1950, but neighbors nearby told him not to go to the farm because there was "trouble up there." They told him there were state troopers, federal investigators and "the

1. The indictment was in two counts, the second charging the appellant Juliano and others not parties to this appeal with violation of Title 26 U.S.C. § 2810 by having custody and control of a still set up that was not registered as required by law. The jury disagreed as to Juliano's guilt on this count.

biggest distillery you ever saw"; whereupon he became "panicky" and went instead to his home in West Berlin, about one hundred miles distant.

The appellants refer to various instances during the trial when the judge participated in the examination of witnesses, and they claim they add up to reversible error. We do not find it necessary to discuss those instances in detail. The record does show that the judge took an active part in the examination of witnesses which seems to have been more extensive and less even tempered than is to be commended. But we do not find, here a situation comparable to that which required reversal in United States v. Marzano, 2 Cir., 149 F.2d 923. And see Billeci v. United States, 87 U.S. App.D.C. 274, 184 F.2d 394, 24 A.L.R.2d 881. Here discretion was exercised within permissible bounds, as shown by such cases as United States v. Aaron, 2 Cir., 190 F.2d 144, and Simon v. United States, 4 Cir., 123 F.2d 80.

There were two instances in which a Treasury agent, as a Government witness, gave unresponsive answers on cross-examination; and appellants Valenti and Giallo claim that the gratuitous observations injected into those answers were so prejudicial that it was erroneous for the court to deny a motion for a mistrial.

■ The first instance was a statement by the witness that he thought Valenti might have known him prior to his arrest. Valenti claims that it was prejudicial for the jury to know that he knew an agent of the Alcohol Tax Unit; but since the court on motion struck the statement, it does not seem at all important.

■ The second instance involved a question about a conversation between the witness and Giallo, and the relevant portion of the record is quoted in the margin.[2] The witness, not in response to the question, said, "I also told him the reason I wasn't arresting him was because he was out on bail—." The reference was to bail for an offense other than the one specified in the indictment. The judge instructed the jury to disregard the statement, but he denied a motion for a mistrial. We do not find error in that ruling. At most the witness' statement tended to show that Giallo had been under arrest, and the jury might well have supposed that the arrest was on the indictment on which he was being tried. But his own attorney increased any likelihood of harm by making it appear of record that he was not arrested on that indictment until

2. "Q. And when you seized the Plymouth black sedan from Mr. Giallo, he told you, to all your questions, directly that he didn't know anything about it and had never been to West Shokan, is that right? A. That is right. I also told him the reason I wasn't arresting him was because he was out on bail—

"Mr. Chapman: I am going to move for a mistrial if we have any more of the voluntary statements, your Honor.

"The Court: Mr. Chapman, don't address the Court in that way.

"Mr. Chapman: No. I, naturally—

"The Court: Don't address the Court in that way.

"Mr. Chapman: I wasn't addressing your Honor in any way, but you can understand my rancor.

"The Court: Mr. Ginanatasio—

"The Witness: Yes, sir?

"The Court: —don't make any statements of that nature again.

"Stricken from the record and the jury are instructed to disregard them and erase them from their minds.

"Go ahead. Next question.

"Mr. Chapman: I think, for the record, I ought to move for a mistrial because the witness has twice volunteered statements not responsive to any questions, and serving to prejudice my client.

"The Court: I don't regard that as prejudicial.

"Mr. Chapman: Your Honor will overrule it?

"The Court: The jury will erase anything from their minds that I have stricken from the record.

"Mr. Chapman: That is a very, sometimes, a very hard thing to do.

"The Court: We will ask the jurors now.

"Do any of you feel that you cannot erase that from your mind, or any of you feel that that remark which I have ordered stricken from the record would prejudice you in any way in the fair consideration of the guilt or innocence of any of these defendants.

"The jury have all indicated in the negative. Your motion is denied.

"Mr. Chapman: Exception."

March 29, 1951, and in this way made it known to the jury that he had been accused of some offense other than that for which he was being tried. However that may be, we think the judge was well within the bounds of sound discretion in denying the motion for a mistrial after having instructed the jury to disregard the statement volunteered by the witness. United States v. Kushner, 2 Cir., 135 F.2d 668; certiorari denied 320 U.S. 212, 63 S.Ct. 1449, 87 L.Ed. 1850; United States v. Tramaglino, 2 Cir., 197 F.2d 928; United States v. Curzio, 3 Cir., 179 F.2d 380.

 When the farm was searched on February 15, 1950, the agents found in the house a coat belonging to Juliano; and in one of the coat pockets there were invoices representing the purchase by Juliano of a septic tank, plumbing pipe, nipples and a refrigerator fan belt, all items which could be used in connection with the operation of a still. In a desk belonging to Juliano there was a scrap of paper containing the name of a person who was named in the indictment as a co-defendant. The invoices and the piece of paper were admitted as Government exhibits, and the appellant Juliano urges that such admission was error. But the invoices and paper were admissible as part of what was discovered on the premises, its weight, if any, as evidence of Juliano's participation in the conspiracy being for the jury. The fact that the government did not show that any of the materials described in the invoices were actually used in connection with the still did not affect their admissibility but only went to their weight as evidence.

After the trial had started, counsel for appellant Juliano moved to suppress the evidence obtained in the search, and he sought to excuse his failure to take such action prior to trial by showing that failure to file the search warrant and the affidavit of the Treasury agents on which it was granted had prevented earlier action. See Federal Rule of Criminal Procedure, 41(e), 18 U.S.C. Neither the affidavit nor the search warrant could be found during the trial, but a Treasury agent named Lane, who with another had executed the affidavit, testified as to what it contained; and the

motion to suppress was denied. After the trial, however, copies of the warrant and supporting affidavit were found, and they were produced at a hearing at which it was found that they provided no substantial basis for the motion to suppress.

The failure to grant that motion is not claimed to have been an error. But it is claimed that there are discrepancies between Lane's statements at the trial and those he made in the affidavit, and that the failure to have the affidavit available at the trial deprived the appellant Juliano of his right to cross-examine. On this ground it is urged that the judge was in error in denying a motion for a new trial.

Lane testified at the trial that late in the afternoon of February 11, 1950, he saw the green-colored truck, already mentioned, backed up to the barn on the Juliano farm and that he heard "thuds" and men talking and saw a large spotlight on the house which went on intermittently while he was making his observations. It was in this way that the agents found out that the truck was being used to carry sugar to the farm. Lane also testified that it was his best recollection that what he then testified he had observed was set forth in the affidavit he executed in support of the application for the search warrant.

In the affidavit it was stated that on February 11, 1950, the agents "received official notification" that the truck had picked up a load of sugar in New York City and that on the next day they watched it, apparently heavily loaded, going north on the highway at Highland, N. Y., and at about 6:50 P.M. saw it enter "the Joseph Juliano premises." The affidavit read further: "On February 13, 1950 affiant Benjamin L. Lane between the hours of 8 P.M. and 10 P.M. observed the farmhouse and the large two story red frame barn on the Joseph Juliano premises. He smelled strong odors of fermenting and cooking mash emanating from the vicinity of the large red barn, heard the sound of pumps working, the rattling of metallic objects and sounds of male voices in and about the large red barn. He also saw a man go from the barn into the farmhouse and later saw a man come from the house and enter the barn."

■ We agree with the trial judge that the unavailability of the affidavit at the trial was no basis for granting the motion for a new trial. To be sure, the witness was mistaken in his recollection as to the date of his observations at the Juliano farm according to the affidavit. He identified the truck on the 12th and made his other observations on the 13th, instead of the 11th, but the exact dates were without significance since all three were before the affidavit was executed. It is unreasonable to suppose that had the affidavit been available for use in his cross-examination the result in this regard would have been more than a correction of his faulty recollection as to the date. That in his testimony he called some of the sounds he heard "thuds" but did not use that word in the description in his affidavit is a discrepancy also trivial.

Judgment affirmed.

FRANK, Circuit Judge (dissenting).

I have great respect for the ability, experience, and integrity of the trial judge. But I think that his participation in this trial far exceeded the limits of judicial discretion. The explanation of this unusual conduct appears pretty clearly in the attempted excuse stated in the government's brief, i. e., the inexperience of the assistant United States attorney who tried the case; as the brief reports, he was "manifestly not a master of the art of cross-examination."

Of course, a federal trial judge is no mere moderator or umpire. He has the duty to ask questions where necessary to elicit truth. And it may have been true in this case that, as the government says, "the questions which were asked by the trial judge were skillfully contrived, and could well have been characterized as effective direct examination, or cross-examination, as the case may be, had they been asked by counsel." That argument, however, ignores this important fact: The judge, on objections by defendants' counsel, would never have allowed the prosecutor to behave as the judge did here, i. e., to interrupt disruptively, by cross-examination, defense counsel's direct examination of witnesses called by the defense. Moreover, as Judge Shelby remarked more than forty years ago, "A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge." [1] I think it significant that my colleagues make no mention of U. S. v. Brandt, 2 Cir., 196 F.2d 653, 655–656, where this court recently held that activities of the trial judge, markedly similar to those here, constituted reversible error. There we said that the trial judge must remain "impartial, judicious, and, above all, responsible for a courtroom atmosphere in which guilt or innocence may be soberly and fairly tested. * * * In the case at bar this mandate of judiciousness appears to have been breached on unfortunately more than a single occasion. Thus the examination of witnesses and discussions with counsel by the court were spotted with a number of remarks which were not of the form to elicit information or direct the trial procedure into proper channels, but rather to cut into the presumption of innocence to which defendants are entitled. Beyond this the court actively cross-examined several witnesses, notably the defendant Brandt himself, to a quite unusual extent. This interrupted the orderly presentation of evidence by the defense. But further the questioning appeared mainly to underline inconsistencies in the positions, or to elicit admissions bearing on the credibility, of defense witnesses." [2] In Brandt's case, the government, on the strength of U. S. v. Aaron, 2 Cir., 190 F.2d 144, cited here by my colleagues, had argued that the charge had cured these defects. This court replied: "Such admonitions may offset brief or minor departures from strict judicial impartiality, but cannot be considered sufficient here. For the 900 questions asked by the court during this eight-day trial

1. Adler v. U. S., 5 Cir., 182 F. 464, 472; see also Hunter v. U. S., 5 Cir., 62 F.2d 217, 220; Gomila v. U. S., 5 Cir., 146 F. 2d 372, 373–375 (reversed for judicial misconduct despite absence of objection from counsel); Williams v. U. S., 9 Cir., 93 F.2d 685; Frantz v. U. S., 6 Cir., 62 F.2d 737, 739.

2. The record here is replete with such interrogation, too extensive for repetition.

present far more examples of serious incidents. The cumulative effect of these we are unable to hold cured by the formal charge given." In the case at bar, in six days of trial, the judge asked more than 700 questions, of which some 250 were directed to Juliano, the one defendant who took the stand.[3]

I would be the last person to suggest that a federal trial judge must not tell the jury his belief about the credibility of the witnesses, provided he promptly—not much later—emphatically warns that the jury must reach their own independent conclusion. But when the judge discloses that belief by his manner of questioning a witness, his belief, being implied and not expressed, is seldom coupled with such a warning. No such contemporaneous warnings were given here during the many hours in which the judge griddled witnesses for the defense. Certainly a trial judge may, and often should, ask questions. Particularly should be interrogate a defendant in a criminal case when defense counsel proves incompetent, a not infrequent situation when defendants have limited financial resources. But when the judge's questions aid the government, he should be singularly careful lest he appear so partisan as to interfere with the (so-called) presumption of innocence. He must then refrain from "exhibiting a prosecutor's zeal, inconsistent with that detachment and aloofness which courts have again and again demanded, particularly in criminal trials. Despite every allowance he must not enter the lists; he must not by his ardor induce the jury to join in a hue and cry against the accused. Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge."[4]

It is no excuse that government counsel lacked experience. As the United States has the largest and most expensive law firm in the country, the judge in such circumstances should at most suggest that the assistant United States attorney be guided by a more-experienced prosecutor.[5] For it is no secret that a defense counsel is at a grave disadvantage whenever the judge, interrogating a witness, puts a question which, if put by the prosecutor, would prompt an objection the judge would be obliged to sustain: If the lawyer objects, he may anger the judge and prejudice the jury against the defendant.[6]

I have not forgotten the comment of

---

3. I do not feel that the quantum of questioning by the court serves alone as an index of the propriety of his participation. But the number here, and the judge's other conduct, make the parallel deadly.

4. L. Hand, C. J., in U. S. v. Marzano, 2 Cir., 149 F.2d 923, 926. I agree that Marzano's case involved a different type of judicial misconduct from that in the Brandt and instant cases, but Judge Hand's statement of the principle is nonetheless applicable.

I am at a loss to understand why my colleagues cite Billeci v. U. S., 87 U.S. App.D.C. 274, 184 F.2d 394, 24 A.L.R. 2d 881, which reversed a conviction with an explanation which I might adopt here, except that it announces a rule, for the conduct of a trial judge, which is perhaps stricter in some respects than I would be ready to accept.

My colleagues say that Simon v. U. S., 4 Cir., 123 F.2d 80, shows that discretion was here exercised within permissible grounds. I think the report of the Simon case discloses no facts which furnish a yardstick for the judge's role in the instant case.

5. The record indicates that the government undertook to provide such guidance at the trial, when Mr. Burchill, an experienced prosecutor, was advising the assistant who tried the case. Thereupon, the following colloquy took place between a defense attorney and the court:

"Mr. McAuley: Your Honor, the defense has no objection to Mr. Burchill conducting the examination if he wishes.

"The Court: Now, Mr. McAuley, there is no reason for you to make any such statement. Sit down. Perfectly proper for Mr. Burchill, assistant United States attorney, to sit there and to aid a younger, junior assistant. Nothing wrong in that.

"Mr. McAuley: I didn't say there was anything wrong.

"The Court: Go ahead.

"Mr. McAuley: I said we are perfectly willing to have the older assistant—

"The Court: You know your comment was improper. Don't do it again. Next question."

6. Adler v. United States, 5 Cir., 182 F. 464, 472; Puttkammer, Administration of Criminal Law (1953), 199–200.

this court in the Brandt case, that "particular incidents are not to be overstressed apart from their context".[7] But (as was true in the Brandt case) the record here shows that the partiality manifest in the court's examination of the defendant Juliano, and of the witnesses (particularly those called by the defense), and in the interjection of cross-examination in the course of direct, was given added color by unwarranted remarks to defense counsel.[8] As Judge A. N. Hand said in another case involving a judge's indiscreet criticism of defense counsel, "The court exhibited unreasonable impatience with defendants' counsel and failed to maintain that detach-

ed and impartial attitude which is necessary to preserve a proper atmosphere and to insure a fair trial. Furthermore, there plainly was no justification for the constant interference by the court with counsel in their attempt to examine their witnesses. It did not expedite matters for the judge to take over such a large proportion of the examination and imposed unmerited burdens."[9]

I repeat that I have the highest respect for the trial judge. Accordingly, I would hesitate to criticize him, were nothing more involved than judicial etiquette. But here the liberty of another human being is at stake.

---

7. 196 F.2d at page 656, fn. 1.

8. I cull the following illustrations:

During examination of the defendant Juliano by his counsel and the court alternately, this colloquy occurred:

"The Court: Do you have another question, Mr. McAuley?

"Mr. McAuley: Yes.

"The Court: I suggest you ask the witness the question, and stop those shenanigans you are doing now.

"Mr. McAuley: I am sorry. I must turn the pages.

"The Court: Do it in the back. You have had that book around for some time.

"Mr. McAuley: Yes, but I haven't lived with it, your Honor. I respectfully except to your Honor's comment.

"The Court: That is your fault.

"Mr. McAuley: I can't take the Government's word—

"The Court: None of these dramatics. Next question.

"Mr. McAuley: No dramatics."

During the prosecutor's examination of a government witness:

"Q. Is Joseph C. Juliano here in this court? A. Yes, he is.

"Q. Will you please point him out? A. He is the man with the blue suit, with the small mustache and heavy hair, black hair.

"Prosecutor: Correctly indicating Joseph Juliano.

"Q. Did you have a conversation with him at that time? A. I did.

"Q. Did you ask him—

"Mr. Chapman (one of defense counsel): Just a moment. Any inquiry made and any answers given would be only binding on Juliano individually.

"The Court: I am the one to make that ruling, Mr. Chapman.

"Mr. Chapman: I understand.

"The Court: Thank you very much for your guidance.

"Mr. Chapman: Your Honor, I am sure you don't mean to be sarcastic to me about that."

Defense counsel had a comb in his hand while cross-examining a government witness. This ensued:

"Q. Mr. Anderson, were you with Investigator Gimantasio on March 1st at the Juliano farm?

"The Court: Will you put that knife away, or whatever you have in your hand.

"Mr. McAuley: Not a knife.

"The Court: Put it in your pocket.

"Mr. McAuley: Yes."

While the defense was cross-examining another government witness, a government agent, the following unusual rebuff was delivered:

"Q. Did you bring them here? Were you asked to bring all your records? A. No. Mr. Valenti rented a truck—

"Q. Just a minute. A. —not long ago from us.

"Q. Just a minute. You answer the question without volunteering anything, please.

"The Court: Let me instruct the witness.

"Mr. Chapman: I wish your Honor would then, if you please—

"The Court: I will give instructions, if necessary. I don't like counsel to usurp my prerogative. Next question."

It should be noted that the exchange quoted in footnote 2 of my colleagues' opinion came on the heels of the Court's refusal to admonish the same witness, a government agent, for his first unresponsive answer to a cross-question.

9. United States v. Minuse, 2 Cir., 114 F.2d 36, 39.